**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


GUADALUPE L. GARCIA, *et al.*,           :
                                         :
          Plaintiffs,                    :
                                         :
     v.                                  :   Civil Action No. 00-2445 (JR)
                                         :
ANN V. VENEMAN, Secretary,               :
United States Department of              :
Agriculture,                             :
                                         :
          Defendant.                     :


<u>**MEMORANDUM ORDER DENYING CLASS CERTIFICATION**</u>

          This case presents claims of discrimination by Hispanic

farmers nationwide who in various ways were denied USDA credit-

and non-credit benefits over a period of some twenty years.

Before the Court for the second time is the question of

whether the case may be certified as a class action.  When the

question was first presented, by a motion for class certification

filed in April 2002, the answer was in the negative, because

plaintiffs had not shown, nor did it appear from the record that

they could show, a common question of law or fact within the

meaning of Fed. R. Civ. P. 23(a).  <u>Garcia v. Veneman</u>, 211 F.R.D.

15 (D.D.C. 2002)(<u>"Garcia I"</u>).  Plaintiffs noticed an appeal from

that order but withdrew the appeal when they were given leave to

conduct limited discovery and invited to supplement their motion,

Tr. of Jan. 15, 2003 Status Hr'g, at 2.  Plaintiffs have now

conducted further discovery — although the discovery has by no

means been as broad and searching as they wished — and they have
presented a supplemental brief on the issue of commonality, which
I have treated as a renewed motion for class certification.
Because I have concluded that plaintiffs' showing is still
insufficient to establish the prerequisites for class
certification established by Rules 23(a)(2), 23(b)(2), and
23(b)(3), and that further discovery is unlikely to change the
picture, I am today issuing a second order denying class
certification.  This ruling, taken together with my earlier
ruling that plaintiffs' claim of failure to investigate did not
state a claim under the Equal Credit Opportunity Act, 15 U.S.C.
§§ 1691 <u>et. seq.</u> (ECOA), or the Administrative Procedure Act, 5
U.S.C. §§ 701 <u>et. seq.</u>, <u>see</u> Mem. Order of Mar. 20, 2002, so
fundamentally alters the posture of this case that plaintiffs
will presumably seek an interlocutory appeal.[1]  I will
accordingly issue a <u>sua sponte</u> order staying proceedings in this
Court so that plaintiffs may seek appellate review of the class
certification question.  <u>See</u> Fed. R. Civ. P. 23(f).  If asked to

---

[1] It is not for me to say whether this ruling is
"questionable," but it may present a "death-knell situation" for
plaintiffs.  <u>See</u> <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>,
289 F.3d 98, 102, 105 (D.C. Cir. 2002).  In any event, this
certification decision presents an "unsettled and fundamental
issue of law relating to class actions, important both to [this]
specific litigation and generally, that is likely to evade end-
of-the-case review." <u>Id.</u> at 105.

do so, I will also certify my Memorandum Order of March 20, 2002
pursuant to 28 U.S.C. § 1292(b).

## Analysis

This Memorandum Order is intended to pick up where
Garcia I left off, and it should be read in conjunction with that
ruling.

## 1.    Proceedings since Garcia I

In Garcia I, I acknowledged the possibility that
statistical analysis demonstrating that Hispanic farmers were
disproportionately denied credit or non-credit benefits on
subjective grounds, such as "character" or "commitment," might
support a finding of commonality.  At a status conference held on
December 18, 2002, shortly after the issuance of Garcia I, I
noted that certification would require more than anecdotal
evidence (the plural of "anecdotes" is not "data").  I said I
thought there must be a way to test plaintiffs' hypothesis
without inspecting the files of 2700 local offices, and I
encouraged plaintiffs to develop a modest discovery plan designed
to link USDA's data to what plaintiffs claimed were subjective
USDA criteria.  At a subsequent status conference, on January 15,
2003, plaintiffs asserted their need for up to 25 depositions and
50 interrogatories, stating that these would involve individuals
in the six states where most of the named plaintiffs reside
(Texas, California, New Mexico, Florida, Washington, and

Colorado).  Plaintiffs also wanted to take Rule 30(b)(6)
depositions of USDA persons who designed the databases that USDA
has said contain all the data that has been captured on its
benefit programs, but that plaintiffs already considered nearly
useless for their purposes.  At that time, I noted that I was
trying to find a balance between plaintiffs' legitimate need to
take discovery, if they had a colorable commonality claim, and
the government's legitimate assertion of burdensomeness.  I
directed plaintiffs to serve their discovery so that I could
evaluate any government objections.

At a status conference held on April 29, 2003, I noted
again that there had to be a way to develop a discovery plan that
would produce a good random sample.  On July 15, 2003, government
counsel asserted an inability to fashion such a sample and
pointed to the databases that the government had already
produced.  Plaintiffs' counsel complained that the databases were
completely unhelpful because they did not indicate why a
particular application had been denied.  Tr. of Jan. 15, 2003
Status Hr'g, at 5-6.  The government finally produced the loan
and disaster benefit files of some 37 of the approximately 110
named plaintiffs.  I instructed plaintiffs' counsel to examine
those files and to advise me whether "there is in those materials
a colorable basis on which plaintiffs can assert that . . . a
substantial number of [the named plaintiffs] were rejected for

loans or benefits on grounds that are the kinds of subjective
grounds that plaintiff[s] assert[] [they] can establish
commonality for." Id. at 22.  I suggested that, upon such a
showing, I might permit further discovery of other files to
provide a basis for a more rigorous statistical comparison.  I
did not lay down a bright line definition of what I thought would
be substantial, but I suggested that 25 out of 37 might be
satisfactory while 5 out of 37 would probably not be.  Id. at 22-
23.

## 2.  Plaintiffs' submission

In their supplemental brief on the issue of commonality
filed on December 5, 2003, plaintiffs reviewed the results of the
discovery they had taken.  They submitted that they had
demonstrated commonality with respect to both disparate impact
and disparate treatment claims, and they urged that, should I
find otherwise, they be permitted further, broad-ranging
discovery.

Plaintiffs' disparate impact theory is that the overall
operation of USDA's farm credit and non-credit benefit programs
is "one practice" (or that it must be so considered because
USDA's failure to collect and maintain data makes it impossible
to analyze the effect of separate components); that this "one
practice" has had an adverse impact upon Hispanic farmers, as
shown by discovery to date; and that class certification is

appropriate because this "one practice" is subjective enough to
come within any but the most rigid construction of the Supreme
Court's dicta in <u>General Telephone Co. of the Southwest v.
Falcon</u>, 457 U.S. 147, 159 n. 15 (1982).  Plaintiffs' disparate
treatment theory asserts that USDA is itself the "single actor"
responsible for a pattern and practice of discrimination against
Hispanic farmers (because USDA has acquiesced in or ratified
notoriously subjective and discriminatory practices of local
offices and county commissioners), and that the sampling of
evidence plaintiffs have been able to gather from the files they
have examined reveals five sub-patterns of discrimination, any
one of which would also support a finding sufficient to satisfy
the commonality requirement of Rule 23(a)(2): (I) refusal to
provide Hispanic farmers with loan applications or assistance in
completing applications; (ii) subjecting Hispanic farmers to
protracted delays in processing and funding their loans;
(iii) using subjective criteria to reject the applications of
Hispanic farmers; (iv) unnecessarily subjecting Hispanic farmers
to the inconvenience of supervised bank accounts; and
(v) delaying or denying loan servicing for Hispanic farmers.

        At the same time that they submitted their supplemental
brief, plaintiffs moved for leave to file a third amended
complaint, setting forth five subclasses of Hispanic farmers,
drawn to fit the sub-patterns plaintiffs claim to have

discovered.  Pls.' Proposed Third Am. Class Action Compl.,
¶ 103.[2]

## 3.   Disparate impact theory

The plaintiff in a disparate impact case must
"isolat[e] and identif[y] the specific employment practices that
are allegedly responsible for any observed statistical
disparities," Watson v. Fort Worth Bank and Trust, 487 U.S. 977,
994 (1988).  Plaintiffs have sought to finesse that requirement
by asserting that isolation and identification are impossible
because USDA did not keep adequate records.  I rejected a variant
of that argument in Garcia I as "unsupported by case authority
and unpersuasive," 211 F.R.D. at 21 n.6, but now plaintiffs have
invoked the 1991 amendments to Title VII, 42 U.S.C. § 2000e-
2(k)(1)(B)(I) — Congress's response to the burden of proof
holding in Wards Cove Packing Co. v. Atonio, 490 U.S. 642
(1989) — to assert (by analogy to employment law) that USDA's
entire decision-making process must be considered "one . . .
practice" because its separate components cannot be analyzed.
Pls.' Mem. in Resp. to Ct.'s July 15, 2003 Order With Respect to
Commonality, at 8 ("Pls.' Mem.").  It is a creative argument, but
ultimately an unpersuasive one.  Not only does it "leapfrog to

---

[2] The amended complaint would also add and emphasize prayers
for equitable relief, since Garcia I rejected Rule 23(b)(2)
certification on the ground, inter alia, that the original
complaint had sought only limited declaratory relief and "no
injunctive relief at all."  211 F.R.D. at 23.

the merits," contrary to the teaching of <u>Eisen v. Carlisle &</u>
<u>Jacquelin</u>, 417 U.S. 156, 177 (1974), as the Government observes,
Def.'s Opp'n to Class Certification & Resp. to Pls.' Dec. 5, 2003
Mem. Regarding Commonality, at 4, but it also boils down to the
proposition that unexplained discrepancies in the distribution of
government benefits satisfy the commonality requirement of Rule
23(a)(2) without more.  That proposition is untenable.  Anecdotal
proof of discrimination against Hispanic farmers, and even
statistical proof that Hispanic farmers have received
proportionally less assistance than others, will not be enough to
support class certification.  <u>Falcon</u> reminds us that the
underlying purpose of the Rule 23(a)(2) commonality requirement
is to permit the court to define the class and determine whether
the representation is adequate, to let the defendant know how to
defend, and "'most significant[ly]'" to guard against the
"potential unfairness to the class members bound by the judgment
if the framing of the class is overbroad."  457 U.S. at 161,
(quoting <u>Johnson v. Georgia Highway Express, Inc.</u>, 417 F.2d
1122(5th Cir. 1969)).  That is why "'precise pleadings'" with
"'reasonable specificity'" are required.  <u>Id.</u> at 160-01.  The
plaintiffs in this case have not identified a USDA credit or
disaster benefit practice established at the national level that
comes close in specificity to the example of a common question
offered by the Supreme Court in <u>Falcon</u> ("a biased testing
procedure to evaluate both applicants for employment and

incumbent employees," 457 U.S. at 159 n.15).  Without such
specificity, <u>Falcon</u> teaches against class certification, except
possibly in the "conceivabl[e]" case where there is <u>both</u>
"significant proof" that the defendant "operated under a general
policy of discrimination" <u>and</u> "the discrimination manifested
itself . . . in the same general fashion, such as through
entirely subjective decisionmaking processes." <u>Id.</u>  As discussed
in later sections of this memorandum, plaintiffs have neither
shown that they can satisfy that test nor established probable
cause to believe that they could do so, if only they could take
more discovery.

**4.  Disparate treatment theory**

Plaintiffs assert (again "leapfrogging to the merits")
that USDA was on notice of discrimination against Hispanic
farmers and that the Secretary "acquiesced in and ratified" that
discrimination by failing to take meaningful corrective measures.
That construction of the alleged facts appears to be an effort to
sidestep my conclusion in <u>Garcia I</u> that "[c]ommonality is
defeated . . . by the large numbers and geographic dispersion of
the decision-makers," 211 F.R.D. at 22, so that, having
identified a "single actor," plaintiffs may go on to assert
USDA's liability for a pattern and practice of discouraging
Hispanic farmers from availing themselves of farm credit and non-
credit programs.  Pls.' Mem., at 30-32.  (Plaintiffs then go on
to identify five sub-patterns and practices by which USDA

- 9 -

allegedly "discouraged" Hispanic farmers: denying applications

and assistance, delaying processing, using "highly subjective

criteria," subjecting them to supervised bank accounts, and

delaying or denying loan servicing.  These alleged practices have

become the labels for the five subclasses plaintiffs now seek to

represent.)

I will step over the threshold question of whether a

private pattern and practice cause of action can ever be

maintained under ECOA.[3]   Neither side has briefed the issue, and

---

[3] Pattern or practice <u>employment</u> cases were originally
legislatively created, first as cases that could be brought only
by the Attorney General, and then as cases that could be brought
by the EEOC.  <u>See</u> <u>Int'l Bhd. of Teamsters v. United States</u>, 431
U.S. 324, 328 n.1, 336 n.16 (1977).  Although the history is
somewhat murky, private class action pattern or practice
litigation appears to be a judge-made construct that arose from
developments in class action litigation and the "private attorney
general" concept.  <u>See, e.g.</u>, <u>Cooper v. Fed. Reserve Bank</u>, 467
U.S. 867, 876 n.9 (1984); <u>Int'l Bhd. of Teamsters</u>, 431 U.S. at
358-60 (1977); <u>Lowery v. Circuit City Stores, Inc.</u>, 158 F.3d 742,
760 (4th Cir. 1998), <u>vacated on other grounds by</u> 527 U.S. 1031
(1999).  <u>See generally</u> Robert Belton, <u>A Comparative Review of
Public and Private Enforcement of Title VII of the Civil Rights
Act of 1964</u>, 31 Vand. L. Rev. 905, 919, 934 (1978).  There is no
language in the ECOA statute supporting private pattern or
practice cases.  The statute contains pattern or practice
language, <u>see</u> 15 U.S.C. § 1691e(h) ("[W]henever he has reason to
believe that one or more creditors are engaged in a pattern or
practice in violation of this subchapter, the Attorney General
may bring a civil action. . . ."), but on its face appears to
contemplate only the government as plaintiff.  ECOA law has
nevertheless been held generally to track Title VII.  <u>See, e.g.</u>,
<u>Haynie v. Veneman</u>, 272 F. Supp. 2d 10, 16 (D.D.C. 2003)
(analogizing ECOA to Title VII); <u>Rosa v. Park W. Bank & Trust
Co.</u>, 214 F.3d 213, 215 (1st Cir. 2000) ("In interpreting the
ECOA, this court looks to Title VII case law. . . .".  <u>But see
Latimore v. Citibank Fed. Sav. Bank</u>, 151 F.3d 712, 713-15 (7th
Cir. 1998) (rejecting the Title VII burden-shifting model for
ECOA).  That may be the reason why a number of courts have simply

- 10 -

I will assume for the sake of argument that plaintiffs' pattern
and practice claims are cognizable.   On the other side of the
threshold, however, lies a question that cannot be assumed away,
namely, whether plaintiffs' sweeping allegations of departmental
acquiescence and ratification will support class certification in
view of <u>Falcon</u>'s concern about "across-the-board" discrimination
claims and its insistence upon specificity in pleading.   That
question must again be answered in the negative.   First,
plaintiffs' reliance upon <u>EEOC v. Inland Marine Industries</u>, 729
F.2d 1229 (9th Cir. 1984), <u>Baer v. First Options of Chicago,</u>
<u>Inc.</u>, No. 90 C 7207, 1993 U.S. Dist. LEXIS 19489 (N.D. Ill. Dec.
3, 1993), and other similar cases is misplaced.   Those cases do
stand for the proposition that a pattern of notice and refusal to
correct can serve as proof of the intent element in an employment
discrimination case, but they do not address the implication of
such a pattern upon class certification.   The holdings of those
cases would not support a conclusion that USDA's alleged
acquiescence and ratification would be enough by itself to
satisfy the commonality requirement.   Proof of conscious inaction

---

assumed without discussion or analysis that ECOA's pattern or
practice language supports a private cause of action.   <u>See, e.g.</u>,
Hargraves v. Capital City Mortg. Corp., 140 F. Supp. 2d 7, 14
(D.D.C. 2000); Sallion v. SunTrust Bank, Atlanta, 87 F. Supp. 2d
1323, 1327 (N.D. Ga. 2000); Rodriguez v. Ford Motor Credit Co.,
No. 01 C 8526, 2002 WL 655679, at *5 (N.D. Ill. Apr. 19, 2002),
<u>Massey v. First Greensboro Home Equity, Inc.</u>, No.
97-1292-CIV-T-17, 1998 WL 231141, at *9 (M.D. Fla. Apr. 27,
1998).   No court has squarely so held.

on the part of USDA (_i.e._, acquiescence and ratification) in the
face of numbers demonstrating that Hispanic farmers suffered
disproportionately high loan rejection rates and received
disproportionately low disaster benefit payments might satisfy
the first _Falcon_ requirement of a "general policy of
discrimination," but it would be no help at all with respect to
the second _Falcon_ requirement of decision-making processes that
were "entirely subjective."  The common discriminatory practice
that _Falcon_ and its progeny requires is still missing.

5.   **Subjective decision-making process**

_____      The class that plaintiffs seek to represent would
include Hispanic farmers who suffered discrimination at the hands
of county agents or county committees – hundreds and perhaps
thousands of decision-makers in who knows how many of the 2700
county offices nationwide that number Hispanic farmers among
their clientele.  _Garcia I_, 211 F.R.D. at 22.  As so described,
the class presents insurmountable problems for plaintiffs in
meeting what the Fourth Circuit has called the "critical" need to
identify "the locus of autonomy in making the challenged . . .
decisions."  _Stastny v. S. Bell Tel. & Tel. Co._, 628 F.2d 267,
279 (4th Cir. 1980).  _Compare_ _id._ _with_ _Rossini v. Ogilvy &
Mather, Inc._, 798 F.2d 590, 598 (2d Cir. 1986) (commonality
supported where "evidence was offered to show that many of the
decisions affecting employees' opportunities for transfer,

training and promotion were made by the same, central group of people. . . .”). See also Webb v. Merck & Co., 206 F.R.D. 399, 406 (E.D. Pa. 2002) (finding class certification inappropriate where employment decisions were made by managers with varying authority in six facilities across five states); Carson v. Giant Food, Inc., 187 F. Supp. 2d 462, 471 (D. Md. 2002) (finding class certification inappropriate when alleged discrimination involved thirteen facilities in five towns or cities), aff'd sub nom Skipper v. Giant Food Inc., No. 02-1319, 2003 WL 21350730 (4th Cir. June 11, 2003), cert. denied, 124 S. Ct. 929 (2003); Zachery v. Texaco Exploration & Prod., Inc., 185 F.R.D. 230, 239 (W.D. Tex. 1999) (finding class certification inappropriate when alleged discrimination made by five hundred and twenty-three autonomous supervisors in fifteen states).  That is why plaintiffs' argument for commonality has focused from the beginning on the subjectivity of USDA's county committee decision-making process.  Plaintiffs must either bring their claims under the "entirely subjective" rubric that the Supreme Court thought might "conceivably" satisfy Rule 23(a) — or fail on their class certification motion.

Before 1997, USDA's regulations set forth seven eligibility criteria:

(1) United States citizenship;
(2) Legal capacity to incur loan obligations;
(3) Education and/or farming experience (at least "1 year's complete production and marketing cycle within the last 5 years");
(4) Character (emphasizing credit history, past record of debt repayment, and reliability) and industry to carry out the proposed operation;
(5) Commitment to carry out undertakings and obligations;
(6) Inability to obtain "sufficient credit elsewhere to finance actual needs at reasonable rates and terms. . . ."; and
(7) Farm size (not to be larger than a family farm).

7 C.F.R. 1941.12 (1997).  <u>See also</u> 7 C.F.R. 1943.12 (1997).[4]

---

[4] In March 1997, the regulations were amended to include eleven eligibility criteria and to make them generally more objective:

(1) United States citizenship;
(2) The legal capacity to incur loan obligations;
(3) Education and/or farming experience (at least "1 year's complete production and marketing cycle within the last 5 years");
(4) Character (emphasizing credit history, past record of debt repayment, and reliability) and industry;
(5) Commitment to carry out undertakings and obligations;
(6) Inability to obtain "sufficient credit elsewhere to finance actual needs at reasonable rates and terms. . . .";
(7) Farm size (not to be larger than a family farm);
(8) and (9) Loan history (restricting the number of prior years in which the applicant could have taken out a direct operating loan);
(10) No previous debt forgiveness causing a loss to the USDA; and
(11) No delinquency on any federal debt.

7 C.F.R. § 1941.12 (1998); 62 Fed. Reg. 9351, 9354 (Mar. 3,

In addition to satisfying those criteria, a farmer also had to submit a Farm and Home Plan, which had to meet with the approval of the loan officer.  A feasible plan is defined as:

> [A] plan based upon the applicant/borrower's records that show the farming operation's actual production and expenses.  These records will be used along with realistic anticipated prices, including farm program payments when available, to determine that the income from the farm operation, along with any other reliable off farm income, will provide the income necessary for an applicant/borrower to at least be able to:
>
> (a) Pay all operating expenses and all taxes which are due during the projected farm budget period;
>
> (b) Meet necessary payments on all debts; and
>
> (c) Provide living expenses for the family members of an individual borrower or a wage for the farm operator in the case of an entity borrower which is in accordance with the essential family needs. Family members include the individual borrower of farm operator in the case of an entity, and the immediate members of the family who reside in the same household.

---

1997).  In February 2003, subsequent to my initial class certification decision in Garcia I, these regulations were amended again to eliminate the character and commitment criteria, deeming them "obsolete."  68 Fed. Reg. 7693, 7694 (Feb. 18, 2003).

The pre-1997 criteria were in force during a good portion of the putative class period.

7 C.F.R. § 1941.4.[5]  I concluded in <u>Garcia I</u> that some of these eligibility criteria, such as "character" or "commitment," are obviously subjective, while others, such as citizenship, legal capacity, inability to obtain credit elsewhere, and farm size, should be classified as objective.  I also ruled that the eligibility factors added in 1997 were objective:  loan history, lack of previous debt forgiveness, and no delinquency on any federal debt.  Overall, I concluded that, because the decision-making process was guided by a number of objective factors, footnote 15 was not triggered.

Plaintiffs ask me to reconsider that overall conclusion, insisting that, of the seven factors set forth in the pre-1997 regulations — citizenship, legal capacity, education/experience, character, commitment, inability to obtain credit elsewhere, and farm size — only citizenship and legal capacity are truly objective.  Plaintiffs argue that the "inability to obtain credit elsewhere" criterion, which I found to be objective in <u>Garcia I</u>, is actually open to subjective interpretation and application.  The regulation provides that an applicant is eligible for a loan only if he or she could not obtain sufficient credit elsewhere to "finance . . . actual needs at reasonable rates and terms, taking into consideration

---

[5] This provision was in force for a good portion of the putative class period.

prevailing private and cooperative rates and terms in the community in or near where the applicant resides for loans for similar purposes and periods of time."  7 C.F.R. § 1941.6. Plaintiffs argue that there was considerable room for local officials to interpret this factor, because, they assert, for most of the time period relevant to this suit, county committees were responsible for determining what were an applicant's "actual needs," what constituted "reasonable rates and terms," and which legal institutions were deemed "near" the applicant's residence. Plaintiffs also maintain that county officials had discretion to define what constituted a "family farm."  The applicable regulation defines a family farm as one which, inter alia, "produces agricultural commodities for sale in sufficient quantities so that it is recognized in the community as a farm rather than a rural residence."  7 C.F.R. § 1941.4.  Plaintiffs also assert that approximately one-third of the examined loan rejections were done "on the basis of character or other similarly highly subjective criteria."  Pls.' Mem. Ex. 7.  And, plaintiffs place considerable emphasis on the USDA requirement that Farm and Home Plans be "feasible."  Infeasibility appears to have been the reason given for more than half of the loan rejections plaintiffs have been able to review.   The feasibility determination is guided by a number of objective inputs, however, including the applicant's own records of the farming operation's

actual production and expenses.  7 C.F.R. § 1941.4.  These
records are combined with other estimates of actual prices to
determine feasibility.  Id.  Even plaintiffs' anecdotal evidence
shows that feasibility was grounded, at least in many cases, on
objective financial data.  See Pls.' Mem. Ex. 7.

          Many of plaintiffs' arguments for reconsideration of my
commonality finding are well taken, and taken together they do
increase the subjectivity quotient of the USDA processes.  The
question is, have plaintiffs succeeded in raising the
subjectivity quotient to the point where it can be said to be
"entirely subjective"?  The answer is no.  Am I treating the
words "entirely subjective" literally, as revealed truth?  Again,
no.  Indeed, there can be no satisfactory resolution to the
dispute about just how subjective is "entirely subjective" within
the meaning of the Supreme Court's oracular Falcon footnote
(which is dicta anyway).  Judge Huvelle recently found the test
to have been met in McReynolds v. Sodexho Marriott Services,
Inc., 208 F.R.D. 428, 441-42 (D.D.C. 2002), an employment case in
which the choice of hiring and promotion criteria was left
entirely to  the individual discretion of thousands of decision-
makers at thousands of sites across the country.  The line may
not be clear, but whatever can be said about the USDA processes
for making loans and giving disaster relief to farmers, they are
(or were) certainly not so subjective as that, or as the process

recently described in <u>Dukes v. Wal-Mart Stores, Inc.</u>, No.
C01-02252, 2004 WL 1385490 (N.D. Cal. June 21, 2004).

**6.   <u>Commonality within proposed subclasses</u>**

        Plaintiffs appear to be arguing that several of the
subclasses they propose to define and seek to represent meet the
standard for commonality wholly apart from any analysis of
subjectivity.  They assert that:

•    "Thirty-four named plaintiffs were either denied
     applications altogether or refused requested assistance in
     completing the loan application."  Pls.' Mem. Ex. 8.

The stories of those 34 plaintiffs include many variations.  One
plaintiff was told to apply first to private banks; another was
told that he did not have enough collateral and was not "offered"
an application; another was told no disaster relief funds were
available; another was treated rudely and was refused assistance
in filling out the necessary forms.  These are, essentially,
thirty-four anecdotes about poor treatment given to individual
Hispanic farmers at eight of USDA's 2700 offices.

•    USDA "discouraged Hispanic farmers from availing themselves
     of farm credit by delaying the processing of their loan
     applications."  Pls.' Mem., at 34.

A narrative presented in Exhibit 9 of Plaintiffs' Memorandum
asserts that 28 of the 35 named plaintiffs for whom discovery has
been received experienced "significant delays in receiving

benefits related to farm programs," and that these delays were
"in violation of the dictates of law and the dictates of
morality."  The material submitted in support of this claim
consists of stories of bureaucratic delays, each one different
from the other.

- USDA "discouraged Hispanic farmers from availing themselves
  of farm credit by delaying or denying loan servicing."
  Pls.' Mem., at 37.

Here again the individual stories of the named plaintiffs are
anecdotes of bureaucracy, geographically dispersed, and quite
different one from another.  See Pls.' Mem. Ex. 11.

- USDA "discriminated against Hispanic farmers through the
  misuse of supervised bank accounts."  Pls.' Mem. Ex. 10.

The deposit of loan proceeds or disaster payments funds into
supervised bank accounts ("SBAs") imposes significant burdens on
farmers.  SBA's should be used only temporarily "to help the
borrower learn to properly manage his/her financial affairs" and
normally not for more than a year.  7 C.F.R. § 1902.2(a)(6),
(a)(4).  Plaintiffs allege that SBA's are frequently imposed on
Hispanic farmers only because they cannot speak English, for no
reason related to their farming experience or ability to manage
their financial affairs, and for periods of longer than a year.
That allegation is serious and comes closer than any of the
others to fulfilling the requirements for class treatment.  It

may be that, as the plaintiffs pursue their individual cases,
facts will emerge that could support class treatment of this
claim in individual offices or in larger districts.  <u>Cf.</u> <u>Castano</u>
<u>v. Am. Tobacco Co.</u>, 84 F.3d 734 (5th Cir. 1996) (finding class
certification inappropriate for "immature" tort that could best
be first developed in individual litigation).  On the basis of
the record in its present state of development, however, even if
the SBA issue provided the requisite commonality, the
requirements of Rule 23(b) have not been satisfied.

## 7. **Rule 23(b) questions**

Even if plaintiffs' proposed subclasses satisfy the
commonality requirement of Rule 23(a)(2), they do not pass muster
under Rule 23(b)(2) or Rule 23(b)(3).[6]  Plaintiffs have done what
they can to shore up their claim to represent a valid Rule
23(b)(2) class by seeking broad and carefully tailored injunctive
relief in their proposed third amended complaint,[7] but their
assertion that USDA "has acted or refused to act on grounds
generally applicable to the class" depends upon the same "one
practice" and "single actor" theories by which plaintiffs have

---

[6] I recognize that since <u>Garcia I</u> the parties have focused
their briefs on Rule 23(a)(2) commonality and imagine that
plaintiffs might have more to say about Rules 23(b)(2) and
(b)(3).  I do not believe that yet another round of briefing
would be productive, however.

[7] And see Submission of Plaintiffs Concerning the Nature of
the Injunctive Relief Sought by Plaintiffs' Proposed Third
Amended Complaint, filed September 2, 2004.

sought to establish Rule 23(a) commonality, and which have already been rejected.  As for Rule 23(b)(3), the discovery difficulties that have been encountered in this case and the diversity of the plaintiffs' anecdotal support for their class certification motion underscore my observations in <u>Garcia I</u> that, if this case were permitted to proceed as a class action, it would "quickly devolve into hundreds or perhaps thousands of individual inquiries about each claimant's particular circumstances," and that "[e]ven if the presence of classwide discrimination were established, individual issues would be much more important to any claimant's recovery." 211 F.R.D. at 24. The history of the <u>Pigford</u> (black farmers) class action litigation[8] amply demonstrates that the certification of a plaintiff class to resolve decades of disputes about loans made or not made and disaster relief provided or not provided to thousands of individual farmers, working under disparate conditions and submitting applications to hundreds of different decision-makers (to say nothing of loan applications offered or not offered, loan applications delayed or not delayed, supervised bank accounts required or not required, and loan servicing provided or not provided), would be only the beginning of a lengthy and difficult process in which, as it turns out, it is

---

[8] <u>Pigford v. Veneman</u>, 1:97-cv-01978-PLF (D.D.C.)

the "questions affecting only individual members" that

predominate.   See Fed. R. Civ. P. 23(b)(3).

## 8. **Further discovery**

Plaintiffs will object – have already objected – that

the denial of class certification at this point is uninformed by

the information they might be able to develop through the broad

discovery program that has been denied them until now, and that

to restrict their discovery to unhelpful and uninformative USDA

databases and to the loan files of their own clients unreasonably

limits their ability to demonstrate the broader pattern of

discrimination that they believe has existed over the last twenty

years of USDA administration of farmers' loan and disaster relief

programs.   That objection is overruled.   What plaintiffs have

been able to assemble and present so far does not give rise to

probable cause to believe that a searching and expensive

discovery program would unearth sufficient evidence of

commonality to support class certification.   The examination of

individual loan files requested is labor intensive, time

consuming, and is no different, or little different, from the

kind of discovery that would be necessary to deal with these

cases individually.

## 9. **Amendment of the complaint**

Plaintiffs' proposed Third Amended Complaint, as

already noted, would add five subclasses of plaintiffs and assert

prayers for injunctive relief.   Leave to amend pleadings is to be "freely given when justice so requires."   Fed. R. Civ. P. 15(a). Because the ruling set forth in this Memorandum Order alters the landscape of this case, however, the appropriate course is to deny leave to amend, without prejudice.

              *       *       *       *       *

          For the reasons set forth above and in <u>Garcia I</u> it is

          **ORDERED** that plaintiffs' motion for class certification [18], as renewed or supplemented by plaintiffs' memorandum on the subject of commonality [107], is **denied.**   It is

          **FURTHER ORDERED** that plaintiffs' motion for leave to file a third amended class action complaint [108] is **denied without prejudice.**   It is

          **FURTHER ORDERED** that defendant's motion to strike [131] is **denied.**   And it is

          **FURTHER ORDERED** that further proceedings in this case are **stayed** pending further order of the Court.




                    JAMES ROBERTSON
                United States District Judge