IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GUADALUPE L. GARCIA, JR.,<br>FOR HIMSELF AND ON BEHALF OF<br>G.A. GARCIA AND SONS FARM<br>9303 North Dona Ana Rd<br>Las Cruces, New Mexico 88007 | )<br>)<br>)<br>) Civil Action No. 1:00CV02445<br>)<br>) |
| and | ) |
| | ) Judge:  James R. Robertson |
| TONY AND PATRICIA JIMENEZ<br>3671 Old Toll Road<br>Cathey's Valley, California 95306 | )<br>)<br>) **THIRD AMENDED CLASS ACTION**<br>) **COMPLAINT** |
| And<br>EDWARD AND NORMA FLORES<br>PO Box 963<br>Chimayo, New Mexico 87522 | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| GLORIA MORALEZ<br>153 North Effie<br>Fresno, California 93721 | )<br>)<br>) |
| and | )<br>) |
| BEATRICE AND RODOLFO GARZA<br>109 North Avenue C<br>Crystal City, Texas 78839 | )<br>)<br>) |
| and | )<br>) |
| LARRY CHAVARRIA<br>AND ROBERT CHAVARRIA FOR<br>THEMSELVES AND ON BEHALF OF<br>CHAVARRIA FARMING CO.<br>PO Box 386<br>Lemoore, California 93245 | )<br>)<br>)<br>)<br>)<br>) |
| ` and | )<br>) |

1

MR. RIGOBERTO BANUELOS                     )
6412 S. Walnut                             )
Fresno, CA 93706                           )
                                           )
        and                                )
                                           )
MR. MODESTO RODRIQUEZ                       )
MR. RUPERTO R. RODRIGUEZ                     )
MR. MODESTA SALAZAR                          )
RODRIGUEZ BROTHERS, INC.                    )
11618 Pompano Lane                          )
Houston, TX 77072                           )
                                           )
        and                                )
                                           )
ON BEHALF OF THEMSELVES AND                 )
ALL OTHERS SIMILARLY SITUATED,             )
INCLUDING BUT NOT LIMITED TO               )
THE FOLLOWING INDIVIDUAL                    )
PLAINTIFFS:                                 )
                                           )
Mr. Esrael Mendoza                          )
PO Box 944                                  )
Willcox, AZ 85644                           )
                                           )
        and                                )
                                           )
Mr. Ysidoro F. Mendoza                      )
PO Box 494                                  )
Willcox, AZ 85644                           )
                                           )
        and                                )
                                           )
Mr. Ruben Alvarez                           )
7336 S. Alta Avenue                         )
Fresno, CA 93654                            )
                                           )
        and                                )
                                           )
Mr. Salvador Amezquita                      )
24795 El Rosario St                         )
Salinas, CA 93906                           )
                                           )
        and                                )
                                           )

Mr. Gustovo Arevalo                   )
228 Tapadero St                       )
Salinas, CA 93906                     )
                                      )
        and                           )
                                      )
Mr. Ricardo Arevalo                   )
228 Tapadero St                       )
Salinas, CA 93906                     )
                                      )
        and                           )
                                      )
Mr. Juan Atayde                       )
12919 Kennedy Circle                  )
Salinas, CA 93906                     )
                                      )
        and                           )
                                      )
Mr. Efrain E. Bernal                  )
490 Pini Rd                           )
Watsonville, CA 95076                 )
                                      )
        and                           )
                                      )
Mr. Alejandro Camargo                 )
1478 E. El Dorado                     )
Reddley, CA 93654                     )
                                      )
        and                           )
                                      )
Mr. Jose Camargo                      )
946 E. Carob Avenue                   )
Reedley, CA 93654                     )
                                      )
        and                           )
                                      )
Mr. & Mrs. Jose Chaidez               )
PO Box 3467                           )
Clovis, CA 93613                      )
                                      )
        and                           )
                                      )
Mr. Valentin Cornejo                  )
153 Live Oak Rd                       )
Watsonville, CA 95076                 )
                                      )
        and                           )
                                      )

3

Mr. Antonio Espindola                    )
41650 Road 68                            )
Diniba, CA 93618                         )
                                         )
        and                              )
                                         )
Mr. Joe Flores                           )
PO Box 2771                              )
Fresno, CA 93745                         )
                                         )
        and                              )
                                         )
Mr. Jaime Fuentes                        )
13665 E. Gettysburg                      )
Sanger, CA 93657                         )
                                         )
        and                              )
                                         )
Mr. Ramon L. Garcilazo                   )
583 Mariposa Street                      )
Salinas, CA 93906                        )
                                         )
        and                              )
                                         )
Ms. Joanne Garza                         )
PO Box 36                                )
Parlier, CA 93648                        )
                                         )
        and                              )
                                         )
Mr. Norbero Iriarte                      )
2035 S Whitney                           )
Fresno, CA 93702                         )
                                         )
        and                              )
                                         )
Mr. Alberto Jauregui                     )
6 Newlyn Street                          )
Salinas, CA 93906                        )
                                         )
        and                              )
                                         )
Mr. Javier Ledesma                       )
PO Box 941                               )
Hollister, CA 95024                      )
                                         )
        and                              )

Ms. Dora Linares                          )
4822 S. Temperance                        )
Fresno, CA 93625                          )
                                          )
        and                               )
                                          )
Mr. Reyes Mancillas                       )
7299 S. East Avenue                       )
Fresno, CA 93725                          )
                                          )
        and                               )
                                          )
Mr. Albert Mendina                        )
10845 S. Walnut                           )
Fresno, CA 93706                          )
                                          )
        and                               )
                                          )
Mr. Angel Medina                          )
86 Hidden Valley Road                     )
Royal Oaks, CA 95076                      )
                                          )
        and                               )
                                          )
                                          )
Ms. Rita M. Moreno                        )
86 Hidden Valley Road                     )
Royal Oaks, CA 95076                      )
                                          )
        and                               )
                                          )
Ms. Florencio R. Orozco                   )
2073 Santa Rita St. #15                   )
Salinas, CA 93906                         )
                                          )
        and                               )
                                          )
Mr. Espirion Puentes                      )
6134 W. Belmont Avenue                    )
Fresno, CA 93722                          )
                                          )
        and                               )
                                          )
Mr. Mateo Ruiz                            )
1023 W. Clayton                           )
Fresno, CA 93706                          )
                                          )

and                                      )
                                         )
Ms. Stella Ruiz                          )
5782 S. Elm Street                       )
Fresno, CA 93706                         )
                                         )
        and                              )
                                         )
Mr. Ignacio Ruiz, Jr.                    )
7135 S. Orange                           )
Fresno, CA 93725                         )
                                         )
        and                              )
                                         )
Mr. Jose Tellez                          )
1151 M Street                            )
Reedley, CA 93654                        )
                                         )
        and                              )
                                         )
Mr. Enrique Vasquez                      )
7671 S. Orange                           )
Fresno, CA 93725                         )
                                         )
        and                              )
                                         )
Mr. Jess Vasquez                         )
1626 E. Floral Avenue                    )
Fresno, CA 93725                         )
                                         )
        and                              )
                                         )
Mr. Tommy Vasquez                        )
4636 W. American                         )
Fresno, CA 93706                         )
                                         )
        and                              )
                                         )
Mr. Frank Velarde                        )
1505 E. Main                             )
Trinidad, CO 81082                       )
                                         )
        and                              )
                                         )
Mr. Alberto A. Acosta                    )
PO Box 333                               )
Animas, NM 88020                         )

and      )
        )
Mr. & Mrs. Jimmy & Elizabeth )
Alvarez       )
Star Route, Box 18    )
Salem, NM 87941    )
        )
and      )
        )
Mr. Juan Cisneros    )
PO Box 704      )
Questa, NM 87556    )
        )
and      )
        )
David Flores      )
173 Chickasaw Road   )
Hagerman, NM  88232   )
        )
and      )
        )
Mr. Oracio Encinias    )
3638 Quay Road 63.8   )
Tucumcari, NM 88401   )
        )
and      )
        )
Mr. Patrick R. Flores    )
PO Box 158      )
Pecos, NM 87552     )
        )
and      )
        )
Mr. Gilbert L. Garcia    )
9300 N. Highway 185   )
Las Cruces, NM 88007   )
        )
and      )
        )
Mr. Homer Garza    )
PO Box 34      )
Mesquite, NM 88048   )
        )
and      )
        )

Mr. & Mrs. F. Richard &                    )
  Mary Helen Llanez                      )
1620 W. OHara Rd                           )
Anthony, NM 88021                          )
                                           )
     and                                  )
                                           )
Mr. Edwardo R. Lopez                       )
10306 St. Hwy 104                          )
Tucumcari, NM 88401                        )
                                           )
     and                                  )
                                           )
Ms. Sonja M. Myers                         )
1356 County Road S                         )
Clovis, NM 88101                           )
                                           )
     and                                  )
                                           )
Mr. Roberto Ortega                         )
1802 W. Washington                         )
Anthony, NM 88021                          )
                                           )
     and                                  )
                                           )
Mr. Robert Ortega, Jr.                     )
855 Royce Road                             )
La Mesa, NM 88044                          )
                                           )
     and                                  )
                                           )
Mr. Edward W. Provencio                    )
PO Box 38                                  )
Chamberino, NM 88027                       )
                                           )
     and                                  )
                                           )
Mr. George L. Provencio                    )
2208 W. Washington                         )
Anthony, NM 88021                          )
                                           )
     and                                  )
                                           )
Mr. Alfredo Alvarez                        )
9747 Southside Road                        )
El Paso, TX 79927                          )
                                           )

and                                      )
                                         )
Mr. Manuel Cantu                         )
PO Box 973                               )
San Juan, TX 78589                       )
                                         )
and                                      )

Mr. Alex Contreras                       )
390 Duhon Drive                          )
Sour Lake, TX 77659                      )
                                         )
and                                      )
                                         )
Mr. Joe Contreras                        )
PO Box 912                               )
Childress, TX 79201                      )
                                         )
and                                      )
                                         )
Mr. Luis Contreras                       )
PO Box 912                               )
Childress, TX 79201                      )
                                         )
and                                      )
                                         )
Mr. Tyn Davis                            )
PO Box 751                               )
Ft. Hancock, TX 79839                    )
                                         )
and                                      )
                                         )
Mr. Hector T. Flores                     )
7535 Adobe Rd.                           )
El Paso, TX 79915                        )
                                         )
and                                      )
                                         )
Mr. Juan J. Flores                       )
7535 Adobe Rd.                           )
El Paso, TX 79915                        )
                                         )
and                                      )
                                         )
Mr. Salvador T. Flores                   )
PO Box 510                               )
Fabens, TX 79838                         )
                                         )

9

and                                    )
                                       )
Mr. Jose Luis Galvan                   )
PO Box 130                             )
Ft. Hancock, TX 79839                  )
                                       )
    and                                )
                                       )
                                       )
Mr. Albert Garcia                      )
470 CR 44                              )
Muleshoe, TX 79347                     )
                                       )
                                       )
    and                                )
                                       )
Mr. Jose Gutierrez                     )
PO Box 21                              )
Maple, TX 79344                        )
                                       )
    and                                )
                                       )
Mr. Alberto M. Ortega                  )
Rt. 3 Box 111                          )
Mercedes, TX 78570                     )
                                       )
    and                                )
                                       )
Mr. Rene Ortega                        )
Rt. 3 Box 108-M                        )
Mercedes, TX 78570                     )
                                       )
    and                                )
                                       )
Mr. Greg Ramon                         )
220 South East 6th Street              )
Morton, TX 79346                       )
                                       )
    and                                )
                                       )
Mr. Guadelupe Rejino                   )
Route 3 Box 285                        )
Muleshoe, TX 79347                     )
                                       )
    and                                )
                                       )

Mr. Roberto Salinas               )
PO Box 176                        )
Smyer, TX 79367                   )
                                  )
        and                       )
                                  )
Mr. Romeo Salinas                 )
PO Box 176                        )
Smyer, TX 79367                   )
                                  )
        and                       )
                                  )
Mr. Erasmo Valdez                 )
RR 3 Box 226-A                    )
Mercedes, TX 78570                )
                                  )
        and                       )
                                  )
Mr. Dionicio Valdez II            )
1201 Lantana Lane                 )
Weslaco, TX 78596                 )
                                  )
        and                       )
                                  )
Mr. Arturo Vasquez                )
PO Box 485                        )
Fabens, TX 79838                  )
                                  )
        and                       )
                                  )
Mr. & Mrs. Rodolfo (deceased) & Delia )
Vasquez                           )
PO Box 595                        )
Fabens, TX 79838                  )
                                  )
        and                       )
                                  )
Mr. David L. Hinojosa, Sr.        )
1215 Boyer Ave.                   )
Walla Walla, WA 99362             )
                                  )
        Plaintiffs,               )
                                  )
        v.                        )
                                  )

MICHAEL JOHANNS, Secretary          )
THE UNITED STATES DEPARTMENT        )
OF AGRICULTURE                       )
14th and Independence Avenue, S.W.   )
Washington, D.C. 20250               )
                                     )
         Defendant.                  )
_____ )

THIRD AMENDED CLASS ACTION COMPLAINT
(FOR DECLARATION JUDGMENT, REVIEW OF AGENCY ACTION,
VIOLATIONS OF EQUAL CREDIT OPPORTUNITY ACT, AND OTHER RELIEF)

I.

OVERVIEW

The Congress has created, and heavily funded with taxpayer dollars, loan programs specifically targeted to provide assistance to those family farmers unable to secure needed capital elsewhere. The United States Department of Agriculture ("USDA"), acting through the Farm Service Agency ("FSA") and formerly through the Farmers Home Administration ("FmHA") (until 1994), is required to administer this loan program in a fair, equitable and non-discriminatory manner. In addition, USDA administers taxpayer funded benefit and disaster relief programs which significantly impact family farmers and which USDA is likewise legally obliged to administer free of discrimination.

This lawsuit arises because, unfortunately, for decades USDA has systematically discriminated against Hispanic farmers and ranchers ("Hispanic farmers"); indeed, against non-white male farmers generally. Black farmers, Native American farmers and female farmers have separately initiated litigation attacking the problem. At the core of each lawsuit is the same problem. Despite repeated warnings of the consequences of doing so, USDA has maintained, and continues to maintain, a system of administering its farm credit and non-credit benefit programs that gives virtually unfettered discretion to local officials to enforce highly subjective

eligibility criteria that, in turn, give vent to hostility toward minority farmers which deprives them of an equal, fair opportunity to participate in such programs.

The hostility toward Hispanic farmers and the resulting discrimination are hallmarks of the decentralized system through which USDA distributes and administers its loan and benefit programs.  More particularly, this discrimination manifests itself, among other ways, by seeking to discourage those Hispanic farmers who would dare attempt to avail themselves of USDA farm credit and non-credit benefit programs.  This discouragement took various forms:  first, Hispanics were consistently discouraged from even applying for loans or benefits; second, those Hispanics who nevertheless persisted in filing an application for loans or benefits experienced long delays in processing their applications; third, they experienced a high denial rate based upon highly subjective eligibility criteria; fourth, those Hispanics to whom loans were granted either experienced prejudicial delays in receiving the needed loans, received less than the requested loan amount or were subject to burdensome supervised bank accounts ("SBAs"), and fifth, when those farmers eventually needed loan servicing assistance, they received delayed or no such assistance.  The difficulty confronting Hispanic farmers is compounded because the USDA mechanism for handling their discrimination complaints—which USDA encouraged aggrieved minority farmers to file—was useless.  USDA failed to investigate the complaints, willfully avoided processing or resolving the complaints, stretched the review process out over many years, conducted meaningless or "ghost" investigations, or simply failed to do anything.  And, USDA has to date failed to take meaningful remedial action to address the situation.

This situation is all the more egregious both because there is no real dispute about the facts and because it has persisted for so long.  Beginning in 1965, the United States Commission on Civil Rights ("Civil Rights Commission") has published a series of studies documenting the

nature and extent of USDA's discrimination against minority farmers in the delivery of loan and

benefit programs. Congressional committees, the General Accounting Office ("GAO") and

others outside USDA have recognized the pervasiveness of the problem and urged USDA to

reform. Indeed, USDA conducted its own internal investigations of the problems, conceded that

the critics were correct, and yet has failed effectively to address, much less to remedy, the

problem. Consequently, notwithstanding all the publicity about this discrimination that infects

USDA's farm credit and non-credit benefit programs and not withstanding all of USDA's lip

service to reform, little has changed for Hispanic farmers.

USDA partially addressed essentially identical complaints by black farmers in the

Pigford et. Al. v. Glickman, Civil Action No. 97-1978 and 185 F.R.D. 82 (D.D.C. 1999)

(approving Consent Decree) ("Pigford"), but has steadfastly refused to accommodate the

concerns of Hispanic farmers. While the Pigford decree refers to certain remedial relief that

relief has proven to be largely illusory in implementation and, for all practical purposes, the

black farmer class received only monetary damages (some $850M to date). This left the USDA

farm and loan benefit system untouched and has become a source of consternation and discontent

to black farmers who received liquidated damages only to be confronted by the same

discrimination the next time they applied for USDA farm credit. In addition, USDA has proven

unable or unwilling to reform itself. Congress has likewise been unable or unwilling to rectify

the situation. Out of desperation Hispanic farmers have chosen the only avenue open to them in

their search for fair and equal treatment. Given the growing numbers of Hispanics who wish to

farm in a effort to improve their economic lot, and given the existence of USDA loan and benefit

programs enacted by Congress for the express purpose of assisting beginning farmers and

ranchers and enabling existing family farms to continue to operate, it is imperative that the Court

ensure that the necessary reforms are finally undertaken. In so doing, the Court will not only fix

the system for Hispanic farmers but for all farmers -- minority and majority farmers. Secondarily, the Court should address the damages that are the natural consequence of the discrimination described herein.  In that connection, the use of computer modeling to calculate any such damages will facilitate the class-wide treatment of such claims.  As the experience of the Pigford class members makes abundantly clear, to award money damages without taking the necessary remedial action to eradiate the systemic discrimination that pervades USDA's credit and benefit programs is, in the final analysis, a prescription for continued discrimination.  This case presents an opportunity to complete the unfinished business left in the wake of the Pigford decree and to eradicate once and for all the discrimination that infects the USDA's farm credit and benefit programs.

## II.

## JURISDICTION

1.     Jurisdiction is founded upon 15 U.S.C. § 1691e(a), 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, 42 U.S.C. § 2000d, 5 U.S.C. § 706 and 7 U.S.C. § 2279.

## III.

## VENUE

2.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e).

## IV.

## PARTIES

3.     Plaintiff and proposed Class representative Guadalupe L. Garcia, Jr., is an Hispanic American farmer and resident of Dona Ana County, New Mexico.  He and his father and brother, also Hispanic American farmers, farmed together as G.A. Garcia and Sons Farm.

They produced cotton, peas, alfalfa, and hay on their farm. They owned two farms in Dona Ana County, one with 550 acres of arable land and the other with 78 acres of arable land. They also leased land occasionally for their farm operation.

4.     In 1986, plaintiff Garcia worked with the assistance of the FmHA personnel to develop a farm and home plan and an application for direct loans, but FmHA rejected the application. In 1988, plaintiff applied for primary loan servicing but was denied this servicing after a two-year delay. Again, in 1994, FSA refused to work with plaintiff on a farm debt restructuring with guaranteed loans. Finally in 1998, when plaintiff needed to sell part of the land to service delinquent debt and had found a buyer, FSA refused to provide financing to allow the sale to take place. In each instance, plaintiff timely filed for the FSA financial assistance programs or loans and was qualified for the assistance and loans, but, due to willful and continuous racial/ethnic discrimination by the local and state FSA offices, was denied the assistance and loans. In each instance, similarly situated white farmers received more favorable treatment. As a result, plaintiff suffered severe economic losses, including a farmer's ultimate penalty—their farms were sold at a foreclosure sale in 1999.

5.     Plaintiff filed several complaints with USDA about this treatment. Guadalupe L. Garcia, Jr., registered a complaint regarding the discrimination with the FSA official that assisted plaintiff prepare the farm and home plan/loan application in 1986. Again, in the early 1990s, he filed a complaint with the office of Senator Dominici and USDA. In 1998 and 2000, he filed additional complaints with USDA's Office of Civil Rights. USDA never acted on these complaints thereby causing plaintiff further damages.

* * *

6.     Plaintiffs and proposed Class representatives Tony and Patricia Jimenez are Hispanic farmers and residents of Mariposa County, California. They operate a 299 acre cattle ranch. Tony Jimenez has lived on a cattle ranch since he was 9 years old, and has life-long experience operating dairy and beef cattle ranches.

7.     They received a $200,000 farm ownership loan from FmHA to acquire the ranch in 1989 and had sought an operating loan at the same time. The operating loan was absolutely essential to enable them to operate the ranch at full and efficient capacity, which was necessary so that they could service the large ownership debt. They were denied the operating loan without explanation. They reapplied for the operating credit in 1990 but were denied. In 1992, they applied for an emergency loan, but were turned down. In 1992, they also requested a 60-day extension on their loan because cattle prices were at a 20-year low and they needed to sell cattle to make their loan installment to FmHA. This too was denied. In December 1995, the Jimenezes paid FSA (formerly FmHA) more than $52,000 to bring the mortgage on the ranch up to date, and at the same time they asked for a loan deferral and an adjustment in the interest rate on the remainder due on the mortgage loan to reflect substantial reduction in interest rates since 1990. FSA did not provide them the application for this servicing for four months. Then, after holding the application for two years, FSA denied it in October 1998.

8.     This extended pattern of denial of loans and services—treatment different than that received by similarly situated white farmers—was a series of acts of willful and continuous racial/ethnic discrimination, and as a result of the discrimination, the ranch operation has suffered severe economic losses and the Jimenezes are on the verge of losing their farm to foreclosure. They filed civil rights complaints with USDA and members of Congress in a timely fashion, but these complaints have never been acted on, causing them further damages.

* * *

9.      Plaintiffs and proposed Class representatives Mr. Edward and Mrs. Norma Flores come from a long tradition of farming.  They began farming in 1972.  For 16 years, Mr. and Mrs. Flores farmed over 300 acres.  Their crops included chili peppers, cotton and cabbage.

10.      Between 1985 and 1988, USDA discriminated against Mr. and Mrs. Flores on at least four separate occasions.  Their experience is typical of other Hispanic farmers in their area.

11.      In January 1985, Mr. and Mrs. Flores applied at their local FmHA office for an operating loan of approximately $100,000.  They needed the loan to prepare for planting their crops by March, but funding was delayed until late May, well after planting season.

12.      A similar incident occurred a year later in 1986.  They again applied for an operating loan in January, which they did not receive until late May.  In addition, FmHA demanded excessive collateral for the loan.  Mr. and Mrs. Flores were required to put up their land (valued at $413,000) and equipment (valued at $60,000) for a loan in the amount of $80,000.

13.      In 1987, Mr. and Mrs. Flores sought assistance from FmHA to refinance their farm, because they were facing foreclosure by the Federal Land Bank.  Mr. and Mrs. Flores needed to take advantage of the lower interest rate offered by FmHA, as opposed to the high 14% interest they were paying.  When they asked the local FmHA agent about refinancing, he replied "You're in a real mess," and refused them an opportunity to apply.

14.      Mr. and Mrs. Flores were discriminated against because they are Hispanic farmers.  Similarly situated white farmers did not receive such treatment.  In 1987, Mr. Flores complained regarding this discriminatory treatment.

18

15.     In 1988, Mr. Flores returned to the local FmHA office to attempt again to refinance his farm.  Contrary to FmHA regulations, the local FmHA office agent refused to discuss refinancing with Mr. Flores until Mr. Flores father had cleared a separate unrelated debt with FmHA.

16.     1988 was the last year the Flores family farmed.  As a result of FmHA discrimination, they lost everything, including 8 farm leases—all of which were taken over by white farmers.

* * *

17.     Plaintiff and proposed Class representative Gloria Palacios Moralez is an Hispanic farmer and resident of Fresno County, California.  Her parents were sharecroppers for 25 years, including when she was growing up; and she learned farming from them.  She also took college courses in agricultural economics, and was selected to be a Kellogg fellow.  She owned and operated an 80-acre farm from 1980 to 1998.  Up until 1994, she grew various field crops and grapes.  In 1998, after repeatedly being denied loans and services from FSA, her land was sold by court order and she lost it.

18.     Ms. Moralez acquired her farm land in 1980 with a $200,000 limited resource farm ownership loan from FmHA.  However, even in this instance, FmHA engaged in discriminatory conduct against her by working hard to discourage her from getting the loan; she got it only through her own dogged persistence and hard work.  Originally, FmHA would not even let her apply for the loan although she clearly had the background and training to qualify for FmHA farm financing.  However, after she refused to take no for an answer, she was allowed to apply—but then only after she was forced to write a special essay and make special

presentations to the Fresno County FmHA staff and county committee.  These unusual

requirements were never applied to white farmers who sought to apply to FmHA for farm

ownership loans.  Further, the chairman of the county committee told her to her face that farming

was "not a proper business for a woman, much less a Mexican woman with two kids."  Once she

filed her loan application, it was improperly rejected two times before it finally was accepted.

One rejection was based on the premise that the property she was trying to acquire did not have

sufficient water to farm it correctly.  However, this same property was being farmed at that time

by two white farmers whose farming operations were financed with FmHA operating loans.

Another reason her application was initially rejected was that the FmHA county office asserted

that she was proposing to pay too much for the land.  However, at the same time, the county

office was making farm ownership loans to white farmers to buy similar land in the area her farm

was located at even higher prices than she proposed to pay.

19.     In 1981, Gloria Moralez applied to the Fresno County FmHA for an equipment

loan of $50,000.  She was approved for only $26,300.  As a result, she could only acquire used

equipment in poor condition that caused her severe problems in growing her crops and reduced

her production.  She also received an operating loan of $31,200 to plant cotton.  Her loan funds

were put in a supervised bank account.  To her information and belief, no similarly situated white

farmers in her area were subject to this sort of treatment regarding reduced funding for

equipment loans and the supervised account.  Further, the Fresno County FmHA staff told her at

that time that she should never apply for another FmHA loan, because they would make sure she

never got one.  In fact, she never did get another FmHA loan.

20.     She continued throughout the years up to 1998 to seek FmHA and FSA loans,

services, and benefits, but was always unfairly discouraged and ultimately denied.  Her

applications included ones for restructuring her debt, so-called "1951-S" servicing, and disaster payments. The 1951-S servicing is an example of the unfair discouragement she received. FmHA valued her farm low for 1951-S purposes so she could not benefit from 1951-S restructuring; but just six months later when she was in bankruptcy, FmHA insisted that the farm had a much greater value for purposes of the bankruptcy action.

21.   In 1993, she applied for disaster payments for losses to her grape crop in 1993 caused by a grape disease known as phomophis. This disease reduced her yield by 69 percent. The Fresno county office told her that thee was no such disease. However, this disease in fact has become epidemic in California in recent years and a threat to the grape industry statewide, with the state and Federal governments spending millions on its eradication. Also, the county office accused her of fraudulently submitting two claims for payments on the loss. In fact, what happened was that she had submitted her disaster application in September 1993, then in December 1993 checked with the Fresno County FmHA to see where it stood. At that time, she was told that they could not locate the September application, and that she must fill out a second application, which she did. Further, when she appealed the denial of disaster benefits to the county committee, she attempted to have a court reporter transcribe the meeting. However, the county committee refused to allow the reporter to attend the meeting, stating that she had to give notice 7 days in advance. The problem was that they had scheduled the meeting one day in advance.

22.   As a result of FmHA/FSA's unfair discouragement and denials, Gloria Moralez could never obtain the financing or program payments she needed to adequately farm her land, and thus her farming enterprise foundered. When she became seriously ill and her mother died in January of 1992, Gloria Moralez was forced to file Chapter 12 bankruptcy. During the five

years she was in bankruptcy, FmHA/FSA continued to harass her. The agency made several attempts to foreclose on her land even though the bankruptcy court had issued a stay on foreclosure proceedings. The agency had gone so far as to order its Kansas City financial office to cut a check for $220,000 so it could buy the land back at foreclosure, even though there was a freeze against foreclosure.

23.     She filed discrimination complaints with USDA in 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1992, 1993, and 1994 regarding the denials and problems she was having with FmHA/FSA, but only on one occasion received a response to her complaint—that regarding the denial of disaster payments in 1993 described above. However, even that action to respond to her complaints was tainted. First of all, she did not get a response to her complaint until 1998. At that time, she received a letter in response to her complaint purportedly signed by an official working for defendant by the name of Wardell Townsend. The letter stated that USDA found no discrimination. The problem with the letter was that Townsend, who supposedly made this conclusion, had left USDA about one year prior to the date he supposedly signed the letter.

24.     The long and persistent pattern of denial of loans and services by FmHA/FSA during the period from 1981 on—treatment different than that the agency gave to similarly situated white farmers—was a series of willful and continuous racial/ethic discrimination; and as a result of the discrimination, Morelez's farm operation suffered severe economic losses and she ultimately lost her 80-acre farm. The absolute refusal by defendant to respond to her repeated complaints of discrimination caused her further damage as the complaints were never investigated and the wrongs committed against her thus have remained un-remedied.

* * *

25.     Plaintiff and proposed Class representatives Rodolfo and Beatrice Garza are Hispanic Americans residents of Zapala County, Texas, who farmed in the 1980s.  Rodolfo Garza had been trained in agriculture at the local junior college, and, in 1983, he and Beatrice Garza acquired 39 acres of farm land in Zapala County from Beatrice's parents for the purpose of starting a vegetable production operation.  This land is located in the Wintergarden area of Texas, which is renown for its production of fruits and vegetables.  Their hometown, Crystal City, is known as the Spinach Capital of the World.  Unable to get FSA financing to operate their farm, they farmed to the extent they could using their personal funds.  They successfully put in several crops of spinach, onions, and grain sorghum.

26.     In 1984 and 1986, the local newspaper ran articles about the availability, at the local FSA office, of loan funds for farming.  In 1984, the Garzas sought a loan to irrigate and put in crops on all 39 acres.  They submitted an application to the local FSA office, and waited for a response.  FSA never responded, so Beatrice Garza contacted the office and was told that no money was available for loans.  However, when she reminded the office of the article in the local newspaper, they simply told her that she and her husband did not qualify.  Again in 1986, having read another article about the availability of funds, the Garzas applied for an operating loan again.  They were turned down again.  The Garzas knew that a number of white farmers who were friends of theirs and similarly situated farmers were able to obtain operating loans from FSA without any trouble.  These included Charles Carr, Lake Smith, and Dorothy Hodges.  In fact, these farmers advised the Garzas to apply to FSA for financing.

27.     Concerned about these repeated denials, Beatrice Garza timely complained by letter to the Secretary of Agriculture in 1986, but never received even a response to the letter.  Having been frustrated at obtaining financing from FSA and unable to finance the farm through

local cooperative or commercial banks, the Garzas had to abandon their farm operation and sell the land. As a result of the discriminatory acts, the Garzas have suffered substantial economic losses and as a result of the Secretary of Agriculture ignoring their complaint about the loan denials, the Garzas suffered further damages.

* * *

28.     Plaintiff and proposed Class representatives Larry and Robert Chavarria are third-generation Hispanic American farmers in Kings County, California. They have been farming for 17 years. They primarily grow crops on the family farm owned by their mother. It is a 640-acre tract with irrigation that is ideally suited for cotton and other row crops, as well as fruits and vegetables. Their grandfather cleared the land in 1944, and their family over the course of years has installed irrigation equipment on the land. They farm together as a general partnership, the Chavarria Farm Co. Neither Larry, Robert, nor the partnership had any dealings with FSA prior to 1997.

29.     In 1995, the partnership suffered severe losses to their cotton crop, as did many other farmers in that area of California. The area was declared a disaster area and the Chavarrias sought to obtain a disaster loan from FSA to cover losses from the 1995 crop. Larry began his inquiries in September 1996, and filed the application in January 1997. Although the application was complete and demonstrated that the Chavarrias and the partnership fully qualified for assistance, the Kings County FSA improperly rejected the application on grounds that were later determined by the National Appeal Division ("NAD") to be without merit. In doing so, the FSA office gave excess credence to the assertions of a white landowner from whom the Chavarrias were leasing farm land and with whom the Chavarrias had a dispute regarding the white landowner's efforts to revoke the lease.

30.     Larry Chavarria appealed the county office decision to the NAD and won the appeal. The hearing officer's decision substantially discounted the credibility of the white land owner and questioned the county office's giving weight to that person's assertions and the county office's abortive efforts to set Mr. Chavarria in a "sting" regarding the crops grown on the disputed lease land.

31.     Even though Larry Chavarria won the appeal, the Kings and Tulane County FSA office continued to subject him and the partnership to unfair treatment. That office has denied them Production Flexibility Contract payments for the 1997 crops; it has been uncooperative and unwilling to work with him on servicing the emergency loan following a second disaster in the area in 1998.

32.     FSA's initial loan denial and inadequate loan servicing were treatment different than that the agency gave to similarly situated white farmers, and amounted to willful and continuous racial/ethnic discrimination. As a result of the discrimination, the Chavarria farm operation suffered substantial economic losses.

33.     Larry Chavarria filed a complaint with the Office of Civil Rights ("OCR") regarding this discrimination in 1999. Incredibly, the OCR responded that FSA's denial of the loan and related unfair acts did not raise an issue of discriminatory conduct by a USDA employee, so it was refusing to investigate the complaint. Further, the response letter was dated April 28, 2000, but was not postmarked until September 12, 2000. The refusal by defendant's agency to respond to the complaint of discrimination caused Larry and Robert Chavarria and the partnership further damage as the complaint was never investigated and the wrongs committed against them thus have remained un-remedied.

* * *

34.     Plaintiff and proposed Class representative Rigoberto Banuelos has been farming in the Fresno, California vicinity since 1988.  He acquired a 10-acre parcel in January 1986 and another 20-acre parcel in May 1988.  Mr. Banuelos grows seedless grapes that are used to make raisins.

35.     In 1988, 1991, and 1992, he went to the Fresno, California FmHA office to inquire into applying for loan assistance.  On each visit Mr. Banuelos was told that there was no money available and that no one in the Fresno office spoke Spanish so they could not talk to him. Although Mr. Banuelos informed the FmHA officials that his wife, who accompanied him on each visit, spoke English well, he was ignored.  He never received an application and was told to try private banks because FmHA could not help him.

36.     Although Mr. Banuelos repeatedly complained that FmHA did not treat him as fairly as they treated white farmers, he was not able to secure a loan from FmHA.  Consequently, he was unable to install a new irrigation system on his farm that would have doubled his productivity.

* * *

37.     Plaintiffs and proposed Class representatives Modesto Rodriguez, Ruperto Rodriguez and Modesta Salazar are shareholders of Rodriguez Brothers Inc ("RBI").  RBI is a family owned farm of 523 acres located outside of Pearsall, TX.  The Rodriguez family has owned the farm since 1952.  From 1982 to 1997, Modesto Rodriguez was the principal operator of the farm.

38.     During the time period covered by the complaint, RBI borrowed funds from the

Frio County FmHA office.  Many, if not most, of the loans made to RBI were required to be

placed in SBAs despite many years of farming experience.  In 1989, RBI submitted a written

complaint alleging that FmHA and its Frio County supervisor discriminating against RBI by,

among other things, imposing SBAs on RBI and USDA's failure to release SBA funds to permit

RBI to feed its livestock during a drought.

39.     In that same year, RBI also sought primary loan servicing.  Nine months later its

application was denied.  RBI appealed the adverse decision and the NAD hearing officer ruled

that the county supervisor had acted improperly in denying the loan application and that RBI was

entitled to a loan and loan servicing.  The hearing officer also found that the continued use of

SBAs was not appropriate and reversed FmHA's decision to impose a SBA.  Despite the

favorable ruling by the NAD hearing officer on behalf of RBI, USDA, more than a decade later,

has yet to provide the required loan servicing to RBI to which it was declared to be entitled.

* * *

40.     Defendant, Michael Johanns, is Secretary of the United States Department of

Agriculture, and is the federal official responsible for the administration of the statutes,

regulations and programs that are the focus of this action.

V.
GENERAL BACKGROUND:  THE USDA FARM LOAN AND BENEFIT PROGRAMS AND
HOW THEY ARE ADMINISTERED

A.     BRIEF DESCRIPTION OF THE PROGRAMS AND HOW USDA IMPLEMENTED
       THEM

41.     The federal agricultural programs at issue in this litigation have their genesis in

the New Deal agriculture reform legislation aimed at controlling farm production, stabilizing

farm income and generally helping farmers remain operational to the extent possible.  In enacting this legislation, Congress recognized that the maintenance of a diverse domestic base of producers of food and fiber—particularly family farms and ranches—was a matter of national security.

42.    Congress provided for the creation of the Agricultural Stabilization and Conservation Service ("ASCS") as the division of USDA charged with the responsibility for administering these programs.  The basic approach to stabilizing farm income and commodity prices was to allow farmers to borrow against their crops and, if prices remained low, the crops would be forfeited to USDA with farmers receiving a high enough support price to permit them to pay off their crop loans and to keep enough money to remain economically viable.  The ASCS was responsible for managing the commodities forfeited to USDA, to purchase other commodities as part of an effort to raise prices and to inspect the warehouses in which the commodities were stored.  The amount of funds available to farmers in these programs and the manner in which the programs are to be administered are periodically modified by Congress with each new farm bill.

43.    Because Congress wanted to maximize the input of local farmer interests in order to ensure that the administration of the ASCS programs truly reflected local needs, it established a decentralized network of county committees ("COC") each composed of three county farmers elected by the farmers from each county.  Each COC hired both the county supervisor who actually ran the county office as well as the local staff who administered the distribution of such payments in each county.  The legislation also provided for a state level committee and a state executive director.  Each COC determined which farmers were eligible for support and benefit payments and worked with the state committee and its director to calculate the amount each

farmer was entitled to.  Although the Secretary of Agriculture, with presidential approval,

technically appoints the state executive director and the state ASCS committee members, the

tradition is that the senior member of each state's congressional delegation who is of the same

political party as the President actually controls the selection process.  The county committee, the

county supervisor and the county staff are state or county employees whose salaries and benefits

are paid from Federal funds appropriated as part of the USDA budget.  Despite this fact, the

Secretary of Agriculture and the Washington headquarters staff have never effectively managed

the state and county offices.

44.    In addition to ASCS, the New Deal reforms enacted by Congress created three

additional farm agencies.  The FmHA which loaned money to farmers who could not obtain

credit elsewhere for land purchases, operating expenses and construction of homes on their

farms, and also provided technical assistance and (unlike traditional lenders) worked closely with

farmers in an effort to help them survive.  These loans include "farm ownership," "operating,"

and "continuing assistance" loans, as well as loans that restructure existing loans and

"emergency disaster" loans.  Congress specifically designed such programs to provide assistance

to those family farms, particularly small, minority and otherwise disadvantaged farmers who

typically cannot secure loans from private lenders.  FmHA thus became the lender of last resort.

45.    In creating FmHA, Congress established a separate, stand-alone FmHA county

committee system which in most important respects paralleled the above-described ASCS county

committee network.  In each state, there was a politically appointed FmHA director, and he

(unlike ASCS) appointed local county FmHA committees whose functions were to initially

determine eligibility for loans and then to review recommendations by the county FmHA offices

regarding which loan applications should be approved.  The county FmHA offices, unlike ASCS, were staffed by federal employees of USDA.

46.     The Soil Conservation Service ("SCS") was created to assist farmers in improving and maintaining the productivity of their land.  Finally, Congress established the Federal Crop Insurance Corporation ("FCIC") to manage the federally subsidized crop insurance programs.

47.     As a consequence of the way Congress structured the mechanisms for administering these farm programs, USDA became a decentralized institution that placed broad, largely unfettered discretion in local officials to apply highly subjective eligibility criteria to farmers seeking to participate in USDA credit and benefit programs.  Historically, USDA has permitted each of the core farm loan and benefit agencies within USDA to function essentially as uncoordinated and independent agencies, each with its own distinct policies, procedures and record keeping requirements and its own separate network of county committees.  Given the vast sums of taxpayer dollars channeled into farm loan and benefits programs via the USDA—until recently it ranked second only to the Department of Defense in the total amount of federal dollars appropriated to it—the virtual lack of true transparency and meaningful accountability which has long characterized USDA stewardship of such monies is unprecedented.

48.     Numerous congressional oversight efforts, GAO studies and other reports—all uniformly critical of the manner in which USDA administered the farm loan and benefit programs—prompted Congress in 1994 to fundamentally reorganize USDA.  In the fall of 1994 ASCS and FCIC were merged to form a new FSA, and the FmHA was split in two with its farm loan division folded into FSA and its home and business loan division absorbed by a newly created Rural Development Agency ("RDA").

49.     The attempt to merge FmHA's farm loan division with the myriad ASCS farm programs has proven to be extraordinarily difficult because the policies, procedures and particularly the "culture" of each agency were so distinct.  The overriding problem is that FmHA employees were direct employees of the federal government operating within policies, procedures and record keeping systems promulgated by USDA headquarters to a much greater extent than ASCS, whereas the members and staff of the ASCS county committees were employees operating outside the federal employee structure in a decentralized manner notwithstanding that federal funding underwrote their salaries.  Additionally, the orientation of each agency and its distinct COC network was markedly different, e.g., ASCS distributed subsidies and disaster payments which generally do not have to be repaid, whereas FmHA made loans which had to be repaid.

50.     Because the parallel decentralized county committee networks which traditionally played a substantial role in the administration of both ASCS benefit programs and FmHA loan programs was obviously unworkable in the revamped system, it was incumbent upon the Secretary to blend the two networks.  It wasn't until the late 1990s that the Secretary decided to make the ASCS COC network preeminent, causing the FmHA network to atrophy.  Although progress has been made in merging these disparate entities, in many areas the intramural tensions and resulting dysfunction remain problematic because of resistance of FmHA employees to accept county employees as coequal colleagues and because the ASCS county employees feared federalization.

51.     The current structure is that in each state the Secretary appoints a state FSA director who is a political appointee anointed by state political apparatus.  Thus, in point of fact the state FSA director is often more beholden to his political benefactors within the state than to

the Secretary.  Furthermore, the surviving county committee system, along with state director

and state committee, created by Congress, continues to exist and function notwithstanding the

absorption of ASCS by FSA, thereby perpetuating the conflicts and confusion which plagues the

administration of these farm programs.

B.    AN OVERVIEW OF THE PROCESS BY WHICH FSA ADMINISTERS FARM LOAN
      AND BENEFIT PROGRAMS.

52.    Generally speaking, the process begins when the Congress annually appropriates

specific amounts of taxpayer dollars to fund the various farm loan programs.  The Secretary of

USDA then allocates a specific portion of those funds to each local FSA office for distribution to

eligible farmers and ranchers.  Should a particular local office not commit all the funds allocated

to it for a particular program, those funds are transmitted back to the Secretary for reallocation to

those county offices which need them.

53.    Virtually every farmer has to borrow the money needed to finance the next

season's crops—the cost of seed, fertilizer, additional equipment or land.  Crop and equipment

loans are very time sensitive—the application needs to be approved and the loan made in

advance of the upcoming planting season.

54.    Many farmers are able to secure the necessary financing from private lenders.  For

new farmers and those whose financial condition fails to meet the standards set by private

lenders, the lender of last resort is USDA which offers both direct loans and guaranteed loans

(the loan is made via a commercial bank on the USDA approved list and USDA guarantees it).

55.    The first step in the process of securing a USDA farm loan is for the farmer to

visit the county FSA office to obtain a copy of the loan application form.

56.     The next step is for the farmer to fill out the loan application and to prepare a
Farm and Home Plan which essentially is a financial (cash flow) plan for his farming operation.
As noted, the regulations created by USDA (7 C.F.R § 1901 et seq.) to govern the loan program
are enormously detailed and complex.  As a consequence, most farmers need considerable
assistance to fully and appropriately complete the complex application paperwork, particularly
the Farm and Home Plan, which is central to the application.  In recognition of this, USDA
regulations direct local FSA loan officers and their staff to provide assistance—particularly to
family farmers—in their efforts to secure the financing necessary to remain operational.
Increasingly, those farmers who can afford to do so hire third party "loan packagers" to guide
them through the application process.  In sum, in order for the USDA loan program to
accomplish its goal of helping those farmers most in need, it is obviously imperative that a spirit
of cooperation and understanding exist between the farmer and the local FSA personnel.

57.     Once all the necessary paperwork is completed to the satisfaction of the local
county FSA loan officer, the application is formally deemed submitted and the review approval
process technically begins to run.  The FSA loan officer reviews the file and makes a
recommendation which he transmits to the COC for approval.  Once approved, the file is sent
back to the FSA loan officer who executes the formal loan documents and arranges for the
transmittal of funds to the farmer.

58.     Prior to the 1994 reorganization the farm loan application/approval process was
all handled within the FmHA, with the county committee making the threshold determination
regarding eligibility and then, if the applicant is deemed eligible, with the county director
deciding both whether the paperwork was properly completed and ultimately whether to approve

the application. Then the county committee staff would administer the loan and provide any necessary servicing.

59.     Should an applicant be unhappy with the decision, he has the right to appeal the decision to the state FmHA committee and, if still unsatisfied, can seek administrative review via the National Appeals Division ("NAD") which is headquartered at USDA headquarters in Washington and maintains a network of regional and state offices.

60.     Additionally, the Equal Credit Opportunity Act ("ECOA") prohibits discrimination in credit based on sex, marital status, race, color, age, national origin, or religion. 15 U.S.C. § 1691(a). If an FSA loan or loan service is denied on discriminatory grounds, the farmer can file a discrimination complaint with the defendant and the FSA Civil Rights Office (for FmHA, formerly the Equal Opportunity ("EO") office) or with the Office of Civil Rights ("OCR") (formerly known as the Office of Civil Rights Enforcement and Adjudication ("OCREA" or "CREA")).

61.     As regards benefit payments, Congress must first appropriate funds earmarked for disaster (freeze; flood; drought; hurricane etc.) relief. Then the funds are allocated to the affected states for distribution to eligible farmers. Prior to the 1994 reorganization a farmer had to visit the local ASCS county office to ascertain whether such funds had been allocated to that county, how many funds remained available and whether the farmer qualified for such payments. The process is administered pursuant to ASCS regulations (7 C.F.R. part 700, et seq. and Commodity Credit Corporation ("CCC") regulations (7 C.F.R. part 1400 et seq.). The ASCS county staff was the initial point of contact and aided the county supervisor in making recommendations to the ASCS county committee as regards eligibility and the amount of benefits to be paid to each farmer. Approval by the county committee was the key. Those not

receiving a favorable response had the right to appeal to the state committee. Post

reorganization, farmers denied benefits continue to have a right of appeal but such appeals are re-

channeled via FSA's NAD. Additionally, the Constitution and Title VI of the Civil Rights Act

of 1964 prohibit exclusion from participation in federal programs based on race, color or national

origin. With respect to ASCS-type applications, if a farm program application is denied on

discriminatory grounds, the farmer can file a complaint of discrimination with the defendant or

OCR.

62.     Post reorganization the functions of the ASCS county office have been

consolidated with the local FSA office, although many of the county staffers still work there.

The allocation of disaster funds available to the affected counties is made at the federal and state

levels, but the determinations regarding eligibility (including inspections of the damage) and the

distribution of the funds is carried out at the local FSA level after the county committee formally

approves recommendations by the local FSA office regarding eligibility and distribution

amounts.

## VI.
## SYSTEMIC DISCRIMINATION AGAINST HISPANIC FARMERS HAS PERVADED THE ADMINISTRATION OF FARM LOAN AND BENEFIT PROGRAMS BY USDA FROM 1981 TO DATE

### A.     THE VARIOUS WAYS IN WHICH HISPANIC FARMERS AND RANCHERS EXPERIENCED DISCRIMINATION WHEN THEY SOUGHT FARM LOANS AND BENEFITS

63.     At the outset it must be emphasized that historically those areas of the United

States where there was a substantial Hispanic population, Hispanics experienced systemic *de*

*jure* and *de facto* discrimination not unlike that experienced by blacks in other parts of the

country. And, USDA's decentralized administration of credit and benefit programs gave full

vent to those regional and local prejudices.

64.     In addition, for those Hispanic farmers who are not conversant with the finer

points of written English the application forms and the extensive directions explaining how to fill

them out, which until recently were available only in English, were daunting obstacles.  These

obstacles were made all the more daunting to some Hispanic farmers because most local FSA

offices, and virtually all of the county committees and county offices, lacked personnel

sufficiently conversation in Spanish to provide the desperately needed guidance.  Even more

fundamentally, the putative class has encountered a wall of hostility, manifested in variety of

ways, from the staff of such offices.  Thus, the Congressional mandate that the local FSA and

county offices work closely and helpfully with all applicants has consistently fallen on deaf ears

in both those decentralized USDA outposts serving areas with heavy Hispanic farm

constituencies and USDA headquarters which is primarily charged with carrying out that

mandate.

65.     Such local offices are dominated by white males who mirrored the anti-Hispanic

prejudices which permeated those areas of the country and, to a large extent, continue to do so.

There was and continues to be hostility toward Hispanics in many of these county and state

offices.  That hostility manifests itself in a variety of ways, including attempting to discourage

Hispanic farmers from availing themselves of farm credit and non-credit benefit programs.

66.     Hostility and discouragement pervade every stage of the credit or benefit process.

Starting with obtaining an application, the Hispanic farmers are often discouraged from even

obtaining an application.  Indeed, it is common for Hispanic farmers to be told that they are too

late because all the loan and/or benefit monies are gone, hence it was pointless to provide an

application to them.  Consequently, a number of Hispanic farmers simply gave up and went

home without an application when so informed.  Those Hispanic farmers who nevertheless

pressed for a copy of an application form were often refused a form because office personnel told the farmers that they either were too late or the office did not have applications, only to discover that white farmers not only still received applications but succeeded in obtaining loan or benefits notwithstanding that the funds allegedly had already been spent or the supply of applications already exhausted.

67.     None of the county offices or FSA offices employed any type of "receipt for service" system which recorded the fact that Hispanic (or any other) farmers visited the office to inquire about programs availability.  Thus, there is no transparency as regards conduct in this crucial aspect of program administration.

68.     Similarly, many Hispanic farmers were advised during their initial visit that they did not qualify for either loans or benefits—this without any application having even been filled out.  Such tactics repeatedly occurred notwithstanding that the regulations promulgated pursuant to the ECOA and USDA's own regulations proscribe efforts to discourage minority farmers from applying for loans. 7 C.F.R. § 1910.

69.     Those Hispanics who succeeded in obtaining the application forms were often denied the assistance needed to both comprehend and properly complete the application.  They would be told that the applications was self-explanatory, and should be completed by the farmer at home.  Hispanic farmers who nevertheless requested help in completing the application were often made to feel stupid for requesting assistance and told that the office personnel did not have time to assist them.  In some instances, they were urged to retain the services of expensive loan packagers, which few could afford to do.

70.     Those Hispanic farmers who persisted and completed the application then had to successfully navigate a two-step process. First, the applicant had to demonstrate that he or she was eligible to receive either a loan or whatever form of benefits (usually disaster benefits) he or she sought. The second step is securing approval of the application itself. For most of the period covered by this complaint, the county committee made this critically important eligibility determination -- the FmHA county committee for loans and the ASCS county committee for benefits and, post the 1994 reorganization, the FSA county committee for both loans and benefits. This localized decision making structure was, from the perspective of Hispanics, fatally flawed in two crucial respects.

71.     First, the county committees were dominated by local white male farmers in what can best be described as a closed system. The Civil Rights Action Team ("CRAT"), a group of senior USDA officials appointed in 1996 by then Secretary Glickman to conduct a comprehensive investigation of alleged systemic discriminatory conduct by USDA, reported that:

> In 1994, 94 percent of all county committees had no female or minority representation. Minority producers were 4.7 percent of eligible voters, but held only 2.9 percent of county committee seats. … GAO found that in 1995, only 36 of the 101 counties with the largest concentration of minority farmers had at least 1 minority county committee member. CRAT Report at p.3.

72.     Thus, in those counties with the largest concentration of Hispanic farmers, the county committees are populated virtually exclusively by non-Hispanics who invariably reflect regional and local anti-Hispanic prejudices. Compounding the problem is the obvious conflict of interest which lies at the core of this localized administrative process—*e.g.* the dominant group of farmers (white non-Hispanic males) controls the distribution of monies for which they themselves also compete. The playing field is clearly not level.

73.    The second major defect in the USDA system is the unfettered discretion vested in the county committees in applying the highly subjective criteria governing the USDA credit and benefit programs.  This combination of anti-Hispanic bias and unfettered discretion invites and facilitates discrimination.

74.    For example, in administering USDA loan programs, the county committee was, for most of the period covered by the complaint, required to consider seven criteria:  (1) United States citizenship; (2) the legal capacity to incur loan obligations; (3) education and/or farming experience in managing and operating a farm or ranch; (4) character and industry to carry out the proposed operation; (5) a commitment to carry out undertakings and obligations; (6) inability to obtain sufficient credit elsewhere; and (7) farm size (the farm to be no larger than a family farm). Once eligibility was determined, the county executive director or loan officer had to approve the loan by determining, *inter alia*, whether the farmer had a viable farm and home plan.  All the criteria except citizenship and age are highly subjective and thus easily subverted by persons practicing discrimination.

75.    Similarly, in administering the disaster benefit and other benefit programs, the county committees are vested with broad discretion in determining which farmers are eligible to receive benefits.  The criteria used are also highly subjective.  For example, the farmer applicant must establish that his disaster related loss isn't related to "the neglect or malfeasance of the producer "...or..." the failure of the producer to follow good farming practices for the commodity and practice." 7 C.F.R. § 1437.9 (b) (1) and (3).  Terms such as "neglect" and "good farming practices" can easily be applied in a subjective, discriminatory and arbitrary manner and given the generalized language in which such decisions are phrased, adverse decisions are difficult to reverse on appeal. The county committees readily understand all this.

76.     The regulations promulgated by USDA to govern the administration of its farm

loan and benefit programs have not only failed to prevent the discrimination experienced by

Hispanic farmers, but have in fact contributed to and facilitated that discrimination by vesting in

local official unfettered discretion to apply highly subjective eligibility criteria.  Despite repeated

warnings that the combination of unfettered discretion and highly subjective eligibility criteria

invites and facilitates discrimination, USDA has done nothing to curtail the delegated discretion

or to reduce the subjectivity in the eligibility criteria.

77.     The record keeping procedures maintained by the county committees and the

local and state USDA offices are grossly inadequate to reveal the true nature and extent of anti-

Hispanic discrimination, which has long pervaded the administration of its farm loan and benefit

programs.  Despite the fact that this historic inadequacy has been well documented throughout

the entire period covered by this complaint and indeed from at least the mid 1960s, USDA has

done nothing to improve its record keeping in a way that would bring transparency to its lending

practices.  Thus the farm loan and benefit programs suffer from a total lack of transparency

regarding the actions at the county and state levels where the discrimination has taken root.

Without transparency there obviously is no accountability, hence the intractability of the

discrimination which has long infected USDA.

78.     As early as 1982 the Civil Rights Commission reported its findings regarding

USDA's discrimination against minorities, noting that as the lender of last resort, the USDA

applied primarily subjective criteria.  The report noted that: "[the] regulations intended to

implement these goals leave room for a wide range of subjective implementation. . . . The

problem of subjectivity permeates much of the FmHA loan decision process. . . . Lack of

specific criteria for loan determinations potentially enhances FmHA's flexibility and ability to

serve clients.  It also creates loopholes which allow for discriminatory treatment." United States

Commission on Civil Rights, The Decline of Black Farming In America, pp. 80-81 (1982).

79.   The various consequences of the decades of discrimination practiced by USDA

against Hispanic farmers in the administration of its farm loan and benefit programs are:

(a)   many Hispanics abandoned their intention to apply for a loan because USDA erroneously asserted that all the loan funds had already been allocated or because the USDA officials refused to provide loan application materials;

(b)   information about availability of disaster payments or other benefit programs was either not communicated effectively to Hispanics at all or too late for them to apply;

(c)   as regards both loan and benefit programs, Hispanics typically experienced hostility, lack of civility, no cooperation or an unwillingness to provide assistance or information at all stages of the application process;

(d)   USDA personnel exercised unfettered discretion discriminatorily to declare Hispanics ineligible to obtain loans or to receive benefits;

(e)   USDA personnel exercised unfettered discretion discriminatorily to deny approval of loans or payments of benefits to Hispanics deemed eligible to apply for loans or benefit payments;

(f)   in those instances in which defendant approved loans or benefit payments to Hispanics, approvals were often untimely (well after the planting season began) and/or for amounts much less than requested;

(g)   defendant often demanded that Hispanics provide a greater amount of collateral for loans than would otherwise be required thereby exposing Hispanics to far greater risk;

(h)   defendant often conditioned its approval of a loan to Hispanics upon a willingness to accept a supervised loan account which required Hispanics to periodically submit to a monitoring of their farming operations by the local FSA office as a condition to receiving each incremental release of previously approved loan funds, which is both burdensome and insulting;

41

(i)      should Hispanics experience difficulty in making loan payments (as all farmers and rancher periodically do given the inherent vicissitudes of nature and commodity markets), defendant failed to provide loan servicing and to otherwise work closely and cooperatively as required by law and regulation in an effort to avoid foreclosure; and

(j)      defendant invariably accelerated the foreclosure process when Hispanics experienced repayment difficulties.

80.      Non-Hispanics, particularly white males, experienced the above described problems to a much lesser extent, if at all, than did Hispanics because they did not experience similarly discriminatory policies, procedures and attitudes by defendant.

B.      THE ANTI-HISPANIC DISCRIMINATION WHICH PERVADES USDA MAKES IT VIRTUALLY IMPOSSIBLE FOR PLAINTIFFS TO SECURE REDRESS THROUGH THE USDA APPEALS PROCESSES

81.      Applicants denied loans or benefits can pursue administrative appeals.  Prior to the 1994 consolidation, FmHA and the ASCS each operated parallel but separate administrative appeals processes.  Thereafter the NAD was created to handle all such appeals, but NAD had no authority to consider discrimination complaints.

82.      When a Hispanic farmer appealed an adverse decision to the NAD and prevailed, often the loan supervisor and county committee would simply refuse to implement the NAD decision and purport to undertake a complete review of the application, often requiring the submission of new information because the application was by then more than 90 days old. Notwithstanding the favorable decision by the NAD with respect to the appeal, the local officials frequently rejected the revised or reviewed application, thereby forcing the farmer to either undertake yet another appeal or give up.

83.      Because there has long been a recognition that discrimination pervades the administration of USDA farm loan and benefit programs, USDA permits applicants to file a

complaint of discrimination either with FSA Civil Rights Office (formerly the FmHA Equal

Opportunity Office) or with Departmental Office of Civil Rights ("OCR") (formerly designated

as the Office of Civil Rights Enforcement and Adjudication) ("OCREA").

84.     In 1983, the enforcement capability of EO and OCREA was so severely curtailed

through lack of funding and lack of interest that USDA essentially had no capability to

investigate civil rights complaints.  This development was not publicized, so plaintiffs, putative

class members and other minorities continued in good faith to file discrimination complaints not

knowing that the investigative staffs had been disbanded and that the complaints were ignored.

This constituted a willful failure by USDA to investigate discrimination in violation of the 1964

Civil Rights Act and the ECOA that continued at least until the mid-1990s.

85.     USDA's refusal to eliminate discrimination from the administration of its

programs and its unwillingness to recognize and endorse the civil rights of Hispanic and other

minority farmers have been widely known, discussed and condemned at least since the mid-

1960s.  Detailed findings demonstrating the pervasiveness of the abuses and the immediate need

for meaningful reform are contained in internal reports by USDA's CRAT and a series of

subsequent progress reports by USDA's Office of Inspector General to then Secretary Glickman

and issued in 1997, and reports by GAO, the Civil Rights Commission and various congressional

oversight committees.

86.     USDA's blatant disregard of the requirements of ECOA and the 1964 Civil Rights

Act—particularly the effective dismantling of the OCR—prompted Congress to enact special

legislation in 1998 (§ 741 of the Omnibus Consolidated Appropriation's Act for Fiscal Year

1999) which waived, inter alia, the ECOA's statute of limitations applicable to claims regarding

farm credit arising between January 1,1981 and December 31, 1996.

87.     USDA has codified regulations, 7 C.F.R. Part 15 - "Nondiscrimination," which state USDA's ostensible policy of nondiscrimination in federally assisted and conducted programs in compliance with Title VI of the Civil Rights Act of 1964.  The regulations should have served as a basis for civil rights compliance and enforcement with respect to participants in FSA programs; however, USDA admitted that the regulations have long been outdated and never accurately reflected the Department's agencies, programs and laws.  *See* OIG Report at 5.

88.     The February 27, 1997 OIG Report addressed complaints of discrimination within FSA as well as 10 other USDA agencies.  OIG found, *inter alia*, that the FSA's discrimination complaint process lacked integrity and accountability, had no effective tracking system, had no process for reconciliation, was in disorder, failed to resolve discrimination complaints, and had a massive backlog.  OIG found that the FSA staff responsible for processing the discrimination complaints consisted of two untrained and unqualified people.  Hundreds of unresolved complaints were over a decade old.  OIG found no management oversight within FSA with respect to the handling of civil rights complaints.

89.     At the same time that OIG released its report, the USDA CRAT Report was released, condemning USDA's lack of civil rights enforcement and accountability as a cause of the drastic decline in the number of minority farmers.

90.     In the CRAT Report, the USDA described the pattern and practice of disparate treatment experienced by minority and limited resource farmers applying to USDA for loans:

> The minority or limited-resource farmer tries to apply for a farm-operating loan through the FSA county office well in advance of planting season.  The FSA county office *might claim to have no applications available* and ask the farmer to return later.  Upon returning the farmer might receive an application *without any assistance* in completing it, then be asked repeatedly to correct

mistakes or complete oversight in the loan application.  Often
those requests for correcting the application could be stretched for
months, since they would come only if the minority farmer
contacted the office to check "on the loan processing." *By the time
processing is completed, even when the loan is approved, planting
season has already passed* and the farmer either has not been able
to plant at all, or has obtained limited credit on the strength of an
expected FSA loan to plant a small crop, usually without the
fertilizer and other supplies necessary for the best yields.  The
farmer's profit is then reduced.  CRAT Report at 15 (emphasis
added).

91.     USDA admitted in the CRAT Report that (a) discrimination complaints at USDA

were often ignored, and

     (a) that farmers reported that even when there was a finding of discrimination,
USDA refused to pay damages.  CRAT Report at 22-23;

     (b) its record keeping on discrimination complaints was "non-existent," that a
backlog existed, and that the largest number of complaints against a single
USDA sub-agency was against FSA.  CRAT Report at 24-25; and

     (c) a lack of diversity in FSA county offices combined with a lack of outreach to
small and limited-resource farmers to directly and adversely affects that
participation of Hispanics and other minorities in USDA programs (CRAT
Report at 26-27), as well as program delivery to minorities and women.
CRAT Report at 45.

92.     USDA admitted that cultural insensitivity interferes with Hispanic participation:

Customers at the recent listening sessions reiterated the special
needs of different minority and socially disadvantaged
communities.  All communities agreed that they are overlooked
when information is released about available USDA programs.
USDA agencies do not make use of minority community
organizational and media outlets to be sure all eligible participants
know about their programs.  Cultural barriers prevent the
communication necessary for good service by USDA programs.

Young men and women who want to follow in the family
footsteps, either by taking over the family farm or by buying their
own, oftentimes find it difficult to obtain financing for their
ventures.  According to several speakers at the listening sessions,
FSA has denied loans to new or beginning farmers despite years of
working on their family farm or receiving advanced degrees in
agriculture.  CRAT Report at 27.

93.     In sum, USDA admitted that USDA does not support or enforce civil rights:

> USDA does not have the structure in place to support an effective
> civil rights program.  The Assistant Secretary for Administration
> lacks authority and resources essential to ensure accountability
> among senior management ranks.  There has been instability and
> lack of skilled leadership at the position of USDA Director of Civil
> Rights.  Dividing up the Department's Civil Rights office between
> policy and complaints has further exacerbated the problem.  The
> division of responsibility for civil rights among different USDA
> offices and agencies has left confusion over enforcement
> responsibilities.  Finally, OGC is perceived as unsupportive of civil
> rights.  CRAT Report at 56.

94.     On September 29, 1997, USDA's Office of Inspector General ("OIG") issued

Phase II of the OIG Report on Civil Rights Issues, entitled "Minority Participation In Farm

Service Agency's Farm Loan Programs – Phase II" ("OIG Report II"), which found, *inter alia*,

that (a) USDA had resolved only 32 of the 241 outstanding discrimination complaints reported in

the OIG Report (back in February 1997) and (b) the backlog of discrimination complaints had

increased from 241 to 474 for FSA and from 530 to 984 for all of USDA.

95.     On September 30, 1998, the USDA's Office of Inspector General released its

"Report to the Secretary on Civil Rights Issues – Phase V" ("OIG Report V") which found that

significant problems within OCR persisted.  It found, *inter alia*:

> a.      The Department through [OCR], has not made significant
> progress in reducing the complaints backlog.  Whereas the
> backlog stood at 1,088 complaints on November 1, 1997, it still
> remains at 616 complaints as of September 11, 1998.  OIG Report
> V, cover letter to Secretary.
>
> b.      The backlog is not being resolved at a faster rate because
> [OCR] itself has not attained the efficiency it needs to
> systematically reduce the caseload.  Few of the deficiencies we
> noted in our previous reviews have been corrected.  *The office is
> still in disarray, providing no decisive leadership and making
> little attempt to correct the mistakes of the past.*  We note with
> considerable concern that after 20 months [OCR] has made

virtually no progress in implementing the corrective actions we thought essential to the viability of its operations. OIG Report V at i (emphasis added).

c.      Most conspicuous among the uncorrected problems is the *continuing disorder within* [OCR]. The database [OCR] uses to report the status of cases is *unreliable and full of errors*, and the files it keeps to store needed documentation are *slovenly and unmanaged*. Forty complaint *files could not be found*, and another 130 complaints that were listed in USDA agency files were not recorded in [OCR]'s database. *Management controls were so poor* that we could not render an opinion on the quality of CR's investigations and adjudications. OIG Report V at iii (emphasis added).

d.      Of equal significance is the absence of written policy and procedures. OIG Report V at iii.

e.      The absence of formal procedures and accurate recording raises questions about due care within the complaints resolution process. *We found critical quality control steps missing at every stage of the process.* Staff members with little training and less experience were put to judging matters that carry serious legal and moral implications. *Many of* [OCR]'s *adjudicators, who must determine whether discrimination occurred, were student interns.* Legal staff members with the Office of General Council ("OGC"), who review [OCR]'s decisions for legal sufficiency, have had to return over half of them because they were based on incomplete data or faulty analysis. We noted that a disproportionately large percent of the 616 cases of unresolved backlog had bottlenecked in the adjudication unit. OIG Report V at iii (emphasis added).

96.     Upon information and belief, this systemic pattern of ineffectiveness has continued. As reported on March 10, 2000, OIG Report VII stated:

a.      This is our *seventh* attempt to provide CR with constructive ways to overcome its inefficiencies. Based on the results of our review and on the operating environment we observed at [OCR], we cannot report encouraging news. OIG Report VII. Viadero cover letter at 1 (emphasis is original).

b.      Based on the findings of our current review on [OCR]'s poor record of responding to our past recommendations, it is difficult to recognize any significant level of progress. Unless [OCR] implements a management plan that addresses effective leadership, changing organizational culture, customer focus, and process re-engineering, we question whether future complaints of

discrimination in the distribution of program benefits will receive due care.  OIG Report VII, Viadero cover letter at 1-2.

c.      Many other critical issues remain unresolved.  Most notably, [OCR] did not re-engineer its complaints resolution process.  Although, [OCR] officials had previously agreed that the system they used to process complaints was neither effective nor efficient and although we recommended a major transformation of this system, *no significant changes in how complaints are processed have been made.*  As a result, we cannot conclude that all complaints are processed with due care.  OIG Report VII at i (emphasis in original).

d.      Since February 1997, we have issued six reports on civil rights issues relating to the program complaints process administered by CR.  Those six reports contained 67 recommendations, 54 of which were directed at CR (the remaining 13 were directed at the Farm Service Agency).  During the current review, we found that 41 recommendations (all directed at [OCR]) have not been adequately addressed by [OCR], based on the actions taken as of December 1, 1999.  As a result, we still have concerns that [OCR] may not be providing due care when processing complaints alleging discrimination in USDA programs.  OIG Report VII at 14.

97.      Upon information and belief, the systematic pattern of ineffectiveness is still affecting USDA today.  Among other things, in its February 2003 report, the EEOC found that:

a.      sub-components to USDA's OCR "'what they want to do' because they have no accountability to [OCR]", EEOC Report at 9;

b.      OCR does not investigate complaints of discrimination within the regulatory time period.  Data supplied by USDA indicates that it takes OCR on average 594 days to complete an EEO investigation.  The EEOC regulations require such an investigation to be completed within 180 days, unless the complainant agrees to an extension of time in writing, for a maximum of 270 days.  *Id.* at 16-17;

c.      OCR does not have an effective EEO complaint tracking system and process.  *Id.* at 18;

d.      data entered into the system is unverified and unreliable.  *Id.* at 20; and

OCR's current interpretation of what is a complaint and when it is officially received undercounts the actual number of

complaints being made to OCR and provides a distorted picture of complaint activity. *Id.*

98.     In sum, USDA's willful disregard of, and failure to properly investigate, discrimination complaints from Hispanics farmers began with the disbanding of civil rights enforcement functions in 1983.  Furthermore, even after February 1997, when the enforcement staff of the OCR was formally reestablished, USDA has failed to afford meaningful investigation and review of discrimination complaints.  Finally, USDA continues to turn a blind eye toward the discrimination against Hispanic farmers in the administration of USDA farm loan and benefit programs which still persists in many local areas which contain large numbers of Hispanics.

## VII.
## STATUTE OF LIMITATIONS IS WAIVED

99.     On October 21, 1998, President Clinton signed into law the Omnibus Consolidated Appropriations Act for Fiscal Year 1999, P.L. 105-277, Div. A, § 101(a) [§ 741], 112 Stat. 2681 (codified at 7 U.S.C. § 2279, Note).  Said legislation waives the statute of limitations for plaintiffs in this case.  In connection with claims arising from acts of discrimination by USDA in its administration of the farm loan and disaster assistance programs which occurred between January 1, 1981 and December 31, 1996.

100.    In addition, other ostensible applicable statutes of limitations applicable to various putative class members are tolled because the failure of such plaintiffs to file timely complaints was caused by actions or inactions caused by USDA of which plaintiffs were unaware owing to defendant's conduct.

101.    Finally, as to acts of discrimination suffered by plaintiffs from October 13, 1998 and beyond the date of the filing of this complaint, there is no statute of limitations issue.

VIII.
CLASS ACTION ALLEGATIONS

102.   Plaintiffs generally bring this class action on behalf of Hispanics who farmed or ranched, or attempted to farm or ranch, during the period January 1, 1981 to the present and who were discriminated against by the USDA on the basis of national origin when they sought to participate on equal terms in farm loan and disaster benefit programs and who complained to USDA about such descrimination.  The predominant purpose in doing so is to achieve definitive and lasting reform of the USDA policies, procedures and practices which permitted this discrimination to occur and endure for so many years, to the end that the transparency and resulting accountability essential to such reform be achieved.  A secondary, but important, purpose is to establish a fair and equitable method of permitting recovery of monetary damages suffered as a consequence of such discrimination to the maximum extent feasible.

103.   The discrimination practiced against plaintiffs occurred at various stages in the process by which USDA administered its farm loan and non-credit benefit programs. Consequently, there are several distinct groups of plaintiffs differentiated by the particular stage of the process where they experienced discrimination, to wit:

a.      Subclass A – those Hispanics whom defendant sought to discourage from availing themselves of USDA farm loan or non-credit benefit programs by refusing to provide either an application form or assistance in completing the application and pursuing the application process;

b.      Subclass B – those Hispanics whom defendant sought to discourage from availing themselves of USDA farm loan or non-credit benefit programs by protracted delays in the processing of their applications and the funding of approval loans.

c.    Subclass C – those Hispanics whom defendant sought to discourage from availing themselves of the USDA farm loan and non-credit benefit programs by the use of highly subjective criteria to reject their applications.

d.    Subclass D – those Hispanics whom defendant sought to discourage from availing themselves of the USDA farm loan or non-credit benefit programs by subjecting Hispanic farmers to supervised bank accounts

e.    Subclass E – those Hispanic farmers whom defendant sought to discourage from availing themselves of farm credit or non-credit benefit programs by delaying or denying loan servicing.

104.    This action is brought and may be properly maintained as a class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and, as appropriate, 23(b)(1), (b)(2) and, or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy and predominance and superiority requirements of those provisions.

105.    The class is so numerous that individual joinder of all the members is impractical and that compelling each plaintiff to institute and pursue a separate action to secure the remedial relief essential to the eradication of systemic, pervasive discrimination practiced against each, and/or to recover monetary damages as compensation for the economic harm caused by discrimination, is both impractical and a needless burden on the courts.  The number of Hispanic farmers in the United States in 2002, the date of the last published Agricultural Census, is approximately 50,592, for all of whom securing remedial relief is essential.

106.    Common questions of law and fact exist as to all members of the class, whether viewed as a Rule 23(b)(2) or (b)(3) class, and predominate over any questions affecting only

individual members of the class. These common legal and factual questions spring from a

central undisputed and overriding reality that for decades the USDA knowingly tolerated the

existence of pervasive discrimination in the administration of its farm loan and disaster benefit

programs created by a highly decentralized, localized system of county committees who were

free to act on a wholly subjective basis with no meaningful supervision from senior management

of USDA. This core factual reality does not vary from class member to class member and may

be established without reference to individual circumstances of any particular class member.

Consequently, the general combination of wholly subjective decision making by local officials

reflecting the prevailing prejudices of each locale, and the lack of oversight by USDA produced

a pattern and practice of discrimination in areas which Hispanic farmers were concentrated, and

this pattern and practice were perpetuated for years in violation of law.

107.    Additional common questions include:

(a)    Did USDA attempt to deny Hispanics farm credit and loan servicing in violation of the ECOA?

(b)    Did USDA seek to deny Hispanic farmers access to non-credit farm benefit programs?

(c)    Did USDA attempt to discourage Hispanics from availing themselves of farm credit and loan servicing in violation of the ECOA, Regulation B promulgated pursuant thereto, and USDA's own regulations with respect to farm credit?

(d)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by denying them applications and assistance in completing applications?

(e)    Did defendant's attempts to discourage Hispanic farmers from availing themselves of farm credit by denying them applications and assistance in completing applications violate the ECOA, Regulation B promulgated pursuant thereto and USDA's own regulations?

(f)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by delaying the processing of their loan applications?

(g)    Did defendant's attempts to discourage Hispanic farmers from availing themselves of farm credit by delaying the processing of their loan applications violate the ECOA, Regulation B promulgated pursuant thereto and USDA's own regulations?

(h)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by using highly subjective criteria to reject their loan applications?

(i)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by using highly subjective criteria to reject their loan applications violate the ECOA, Regulation B promulgated pursuant thereto and USDA's own regulations?

(j)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by subjecting them to supervised bank accounts?

(k)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by subjecting them to supervised bank accounts violate the ECOA, Regulation B promulgated pursuant thereto and USDA's own regulations?

(l)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by delaying or denying loan servicing?

(m)    Did defendant attempt to discourage Hispanic farmers from availing themselves of farm credit by delaying or denying loan servicing violate the ECOA, Regulation B promulgated pursuant thereto and USDA's own regulations?

(n)    Did defendant fail to investigate or to process discrimination complaints made by Hispanic farmers?

(o)    Did defendant's failure to investigate or to process Hispanic farmers' civil rights complaints violate the ECOA?

108.    Plaintiffs' claims are typical of the claims of the members of the class, all of whom, by virtue of USDA's arbitrary and unlawful actions, have been denied equal access to

53

loans or loan servicing, and to non-credit benefit programs, and were denied due process in the enforcement of their discrimination complaints, and have been subject to USDA's institutional and systematic failure to enforce the civil rights laws intended to benefit plaintiffs and members of the class.

109.   Plaintiffs are adequate representatives of the class because they are members of the class and their interests do not conflict with the interests of the members of the class they seek to represent.  The named plaintiffs' claims are consistent with the claims of other class members.  Plaintiffs' counsel are experienced class action lawyers who will adequately represent the class.

110.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of class members' claims regarding USDA's institutional and systematic deprivation of their civil rights as described in this Complaint is impracticable.  Even if any class members could afford to litigate, it would be unduly burdensome to the courts to litigate each individual case.  Individual litigation further presents a potential for inconsistent or contradictory judgments and increases the delay and expenses to all parties and the court system in resolving the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of what essentially is one problem, economies of scale, and comprehensive supervision by a single court.  Notice of the pendency of any resolution of this class action can be provided to class members by publication and broadcast; in addition, each class member's farm number, address, application date and payment results is readily available to defendants.

## COUNT I
(Declaratory Judgment)

111.   Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

112.   An actual controversy exists between plaintiffs and class members and defendant as to their rights with respect to defendant's farm loan and non-credit benefit programs.

113.   Plaintiffs and the class members pray that this Court declare and determine, pursuant to 28 U.S.C. § 2201, the rights of plaintiffs and class members under defendant's farm programs including their right to equal credit, and to equal participation in farm loans and disaster benefit programs, and their right to full and timely enforcement of national origin discrimination complaints.

## COUNT II
(Violation of Equal Credit Opportunity Act)

114.   Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

115.   USDA's acts of denying plaintiffs and class members applications for loans and requests for loan servicing, delaying the processing of their applications, rejecting applications on highly subjective eligible criteria, subjecting them to SBAs, denying or delaying loan servicing, and systematically failing to properly process or to investigate their discrimination complaints was discrimination on the basis of national origin and, was contrary to the requirement of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a).

## COUNT III
(Violation of Administrative Procedure Act)

116.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

117.    USDA's acts of denying plaintiffs and class members equal access to non-credit benefit programs and of systematically failing to properly investigate and/or process their discrimination complaints were contrary to the requirements of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

Prayer for Relief

Wherefore plaintiffs respectfully request this Court to:

1.    declare that the practices, policies, patterns, and procedures described in this Complaint exist at the USDA and that they are unlawful;

2.    issue a permanent injunction prohibiting the defendant, the USDA, its officers, agents, employees and successors from engaging in discrimination in the administration of USDA farm loan and non-credit benefit programs as alleged herein, including but not limited to:

(a)    refusing to provide applications to, deterring, or otherwise attempting to deter or discourage Hispanic farmers from applying for farm loans and non-credit benefits;

(b)    applying more stringent underwriting standards or otherwise discriminatorily denying loans to Hispanic farmers who otherwise were qualified;

(c)    providing inadequate or less assistance to Hispanic farmers in completing farm loan applications and/or farm and home plans and in applying for non-credit benefits;

(d)      granting loans to Hispanic farmers and ranchers on differential and less advantageous terms than similarly situated white male farmers; and

(e)      discriminatorily denying Hispanic farmers and ranchers servicing on their loans, or providing less advantageous servicing to Hispanic farmers than that offered to similarly situated white male farmers.

3.      issue a permanent injunction requiring that the USDA adopt lending practices in conformity with the requirements of the Equal Credit Opportunity Act and the Administrative Procedure Act;

4.      issue an order mandating that USDA remedy its discriminatory patterns and practices by:

(a)      taking affirmative action to advertise in appropriate media outlets designed to reach Hispanic farmers that USDA encourages and welcomes Hispanic farmers to avail themselves of all of the services offered by USDA and that any action taken by any USDA employee or representative that in any way makes Hispanic farmers feel unwelcome or seeks to deter them from availing themselves of all services provided by USDA shall be reported to the Secretary via a toll free 800 number and fully investigated;

(b)      adopting a system of providing a receipt for service to all farmers and ranchers who visit local FSA offices to inquire about, or to apply for, USDA farm loans or non-credit benefits;

(c)      requiring FSA personnel to provide full and equal assistance to all farmers who request it without regard to sex, race, national origin, marital status or any other discriminatory basis proscribed by the ECOA;

57

(d)     providing applications and explanations regarding both the farm loan and disaster benefit programs in Spanish;

(e)     providing that those local FSA offices serving areas with large numbers of Hispanic farmers and ranchers employ persons both fluent in Spanish and familiar with Hispanic culture to assist Hispanic farmers and ranchers in applying for farm loan and non-credit benefit programs and in securing appropriate levels of servicing and other forms of assistance as necessary;

(f)     providing, for a period sufficient to ensure that long standing discriminatory practices finally end, a system by which Hispanic farmers and ranchers who are or have been aggrieved by conduct at local FSA offices have an opportunity for an expedited review via independent mediators; and

(g)     providing that those state and local FSA offices servicing Hispanic farmers and ranchers provide semi-annual reports to the Secretary detailing the particulars of each application for farm loans and disaster benefits by Hispanics and the disposition thereof;

5.     to require that USDA, under supervision of the Court, promptly redesign its computerized data collection system as regards its administration of farm loans and non-credit benefit programs in order to ensure that full transparency is achieved and to permanently enjoin defendant and her successors from modifying the data collection system in any manner that has the effect of reducing or in any way hindering the transparency of the data collection system;

6.     once the modernization of the data collection system as described in ¶5 supra is accomplished, to require the Secretary to issue public annual reports detailing the extent of Hispanic participation in such programs;

7.      to devise a method, consistent with avoiding undue burden upon the Court and

defendant and mindful of the public interest in ensuring that fraud be avoided to the maximum

extent practicable, by which to award compensatory damages to deserving plaintiffs;

8.      award reasonable attorneys' fees and costs, including expert fees, and interest;

and

9.      order such other and further relief, including but not limited to such specific

remedies, as the Court deems just and proper.

Respectfully submitted,

Of Counsel:

Kenneth C. Anderson #243962
Robert L. Green, Jr. #935775
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 783-0800
(202) 383-6610

_Steph S. Hill_
_____
Alan M. Wiseman #187971
Stephen S. Hill #927137
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 783-0800
(202) 383-6610 – Fax

Alexander J. Pires, Jr. #185009
CONLON, FRANTZ, PHELAN & PIRES, LLP
1818 N Street, N.W.
Suite 700
Washington, D.C. 20036
(202) 331-7050
(202) 331-9306 – Fax

Philip Fraas #211219
3050 K Street, N.W.
Suite 400
Washington, D.C. 20007
(202) 342-8864
(202) 342-8451 – Fax

Attorneys for Plaintiffs
GUADALUPE L. GARCIA, JR., et al.

Date:  June 28, 2006